**STEVE JACKSON GAMES, INC.,** Steve Jackson, Elizabeth McCoy, Walter Milliken, Steffan O'Sullivan

v.

**UNITED STATES SECRET SERVICE,** United States of America.

**No. A 91 CA 346 SS.**

United States District Court, W.D. Texas, Austin Division.

March 12, 1993.

Sharon L. Beckman, Harvey A. Silverglate, Andrew Good, Silverglate & Good, Boston, MA, Eric M. Lieberman, Nicholas E. Posser, Rabinowitz, Boudin, Standard, et al., New York City, R. James George, Jr., George Donaldson & Ford, Austin, TX, for plaintiff.

Mollie S. Crosby, U.S. Atty.'s Office, Austin, TX, Vincent M. Garvey, U.S. Dept. of Justice, Civil Div., Washington, DC, Ellen A. Lockwood, Asst. U.S. Atty., San Antonio, TX, Andrea W. McCarthy, Joseph V. Jest, Mark Batten, Civil Div., Colleen B. Grzeskowiak, U.S. Dept. of Justice, Federal Programs Branch, Washington, DC, for defendants.

## OPINION

SPARKS, District Judge.

### I.  Facts

The issues remaining at trial in this lawsuit involves the Plaintiffs Steve Jackson Games, Incorporated, Steve Jackson, Elizabeth McCoy, Walter Milliken, and Steffan O'Sullivan's causes of action against the United States Secret Service and the United States of America pursuant to three statutes, "Privacy Protection Act", 42 U.S.C. 2000aa *et seq.;* "Wire and Electronic Communications Interception and Interception of Oral Communications" Act, 18 U.S.C. 2510, *et seq.;* and "Stored Wire and Electronic Communications and Transactional Records Access" Act, 18 U.S.C. 2701, *et seq.* All other issues and parties have been withdrawn by agreement of these remaining parties.

The individual party plaintiffs are residents of the states of Texas and New Hampshire, and the corporate plaintiff is a Texas corporation with its principal place of business in Austin, Texas.

The Plaintiff Steve Jackson started Steve Jackson Games in 1980 and subsequently incorporated his business. Steve Jackson Games, Incorporated, publishes books, magazines, box games, and related products [1]. More than 50 percent of the corporation's revenues are derived from its publications. In addition, Steve Jackson Games, Incorporated, beginning in the mid–1980s and continuing through this litigation, operated from one of its computers an electronic bulletin board system called Illuminati. This bulletin board posts information to the inquiring public about Steve Jackson Games' products and activities; provides a medium for receiving and passing on information from the corporation's employees, writers, customers, and its game enthusiasts; and, finally, affords its users electronic mail whereby, with the use of selected passwords, its users can send and receive electronic mail (E-mail) in both public and private modes. In February of 1990, there were 365 users of the Illuminati bulletin board.

Steve Jackson was both the owner and employee of Steve Jackson Games, Incorporated, and authored many of its publications; he used both Illuminati's public and private programs for electronic mail and his use ranged from business records of the corporation, contracts with his writers, communication with his writers regarding articles which were intended to be published by the corporation, to private communications with his business associates and friends. Elizabeth McCoy's use of the Illuminati bulletin board involved her participation as a game player, her critiques as to the games and publications of the corporation, and her private communications with associates and friends. William Milliken's use of the Illuminati bulle-

---

1. While the content of these publications are not similar to those of daily newspapers, news magazines, or other publications usually thought of by this Court as disseminating information to the public, these products come within the literal language of the Privacy Protection Act.

tin board was apparently limited to private communications to associates and friends. Steffan O'Sullivan's use of the Illuminati bulletin board included writings for publication by Steve Jackson Games, Inc., his business dealings with the corporation, and public and private communications with associates and friends.

Importantly, prior to March 1, 1990, and at all other times, there has never been any basis for suspicion that any of the Plaintiffs have engaged in any criminal activity, violated any law, or attempted to communicate, publish, or store any illegally obtained information or otherwise provide access to any illegally obtained information or to solicit any information which was to be used illegally.

In October of 1988, Henry Kluepfel, Director of Network Security Technology (an affiliate Bell Company), was advised a sensitive, proprietary computer document of Bell South relating to Bell's "911 program" had been made available to the public on a computer bulletin board in Illinois. Kluepfel reported this information to Bell South and requested instructions, but received no response. In April of 1989, Kluepfel confirmed the 911 Bell document was available on the Illinois computer bulletin board and learned the document was additionally available without any proprietary notice on at least another computer bulletin board and had been or was being published in a computer bulletin board newsletter in edited form. In July of 1989, Kluepfel was finally instructed by Bell South to report the "intrusion" of its computer network to the Secret Service and that the document taken was "sensitive" and "proprietary." Kluepfel had previously worked with the Secret Service and was known as an expert and reliable informant on computer "hacking."[2] Thereafter, Kluepfel met Assistant U.S. Attorney William Cook in Chicago and thereafter communicated with Cook and Secret Service Agent Tim Foley. Agent Foley was in charge of this particular investigation.

Around February 6, 1990, Kluepfel learned that the 911 document was available on a computer billboard entitled "Phoenix" which was operated by Loyd Blankenship in Austin,

Texas. Kluepfel "downloaded" the document to put in readable form and then advised these facts to the Secret Service. Prior to February 26, 1990, Kluepfel learned that Blankenship not only operated the Phoenix bulletin board, but he was a user of the Illinois bulletin board wherein the 911 document was first disclosed, was an employee of Steve Jackson Games, Inc., and a user of the Steve Jackson Games, Inc.'s bulletin board "Illuminati." Kluepfel's investigation also determined that Blankenship was a "co-sysop" of the Illuminati bulletin board, which means that he had the ability to review anything on the Illuminati bulletin board and, importantly, maybe able to delete anything on the system. Blankenship's bulletin board Phoenix had published "hacker" information and had solicited "hacker" information relating to passwords, ostensibly to be analyzed in some type of decryption scheme. By February 26, 1990, Kluepfel determined that the Phoenix bulletin board was no longer accessible as he could not "dial" or "log into" it. He reported this to Agent Foley. While Kluepfel advised Agent Foley that Blankenship was an employee of Steve Jackson Games, Inc., and was a user and co-sysop of Illuminati, Kluepfel never had any information whereby he was suspicious of any criminal activity by any of the Plaintiffs in this cause. Kluepfel was, and is, knowledgeable in the operation of computers, computer bulletin boards, the publishing of materials and documents by computers, the communications through computer bulletin boards (both public and private communications), and could have "logged" into the Illuminati bulletin board at any time and reviewed all of the information on the bulletin board except for the private communications referred to by the Plaintiffs as electronic communications or electronic mail, but did not do so. Kluepfel had legitimate concerns, both about the 911 document stolen from Bell South and the possibility of a decryption system which could utilize passwords in rapid fashion and could result in intrusions of computer systems, including those of the Bell System.

In February of 1990, Agent Foley was also knowledgeable about computer bulletin

---

2. A "hacker" is an individual who accesses another's computer system without authority.

boards and he too could have "logged" into Illuminati, become a user and reviewed all public communications on the bulletin board, but did not do so.

By February 28, 1990, when the search warrant affidavit was executed, Agent Foley had received information from reliable sources (Kluepfel, Williams, Spain, Kibbler, Coutorie, and Niedorf, and possibly others[3]) there had been an unlawful intrusion on the Bell South computer program, the 911 Bell South document was a sensitive and proprietary document, and that computer hackers were attempting to utilize a decryption procedure whereby unlawful intrusions could be made to computer programs including the Defense Department, and these hackers were soliciting passwords so that the decryption procedure could become operational. In addition, Agent Foley was advised Loyd Blankenship had operated his Phoenix bulletin board from his home, had published the 911 Bell South document in edited form, and had published and communicated that a decryption strategy was available and other "hackers" should submit selective passwords to finalize the decryption scheme for intrusions into computer systems by using a rapid deployment of passwords. Agent Foley was also advised that Blankenship was an employee of Steve Jackson Games and had access to the Illuminati bulletin board as a user and a co-sysop and he may well (and in fact did) have the ability to delete any documents or information in the Steve Jackson Games computers and Illuminati bulletin board. The only information Agent Foley had regarding Steve Jackson Games, Inc. and Steve Jackson was that he thought this was a company that put out games, but he also reviewed a printout of Illuminati on February 25, 1990, which read, "Greetings, Mortal! You have entered the secret computer system of the Illuminati, the on-line home of the world's oldest and largest secret conspiracy. 5124474449300/1200/2400BAUD fronted by Steve Jackson Games, Incorporated. Fnord." The evidence in this case strongly suggests Agent Foley, without any further investigation, misconstrued this information to believe the Illuminati bulletin board was similar in purpose to Blankenship's Phoenix bulletin board, which provided information to and was used by "hackers." Agent Foley believed, in good faith, at the time of the execution of his affidavit on February 28, 1990, there was probable cause to believe Blankenship had the 911 Bell South document and information relating to the decryption scheme stored in his computer at home or perhaps in computers, disks, or in the Illuminati bulletin board at his place of employment at Steve Jackson Games, Inc.; that these materials were involved in criminal activities; and that Blankenship had the ability to delete any information stored on any of these computers and/or disks.

Unfortunately, although he was an attorney and expressly represented this fact in his affidavit, Agent Foley was not aware of the Privacy Protection Act, 42 U.S.C. 2000aa *et seq.*, and he conducted *no* investigation about Steve Jackson Games, Incorporated, although a reasonable investigation of only several hours would have revealed Steve Jackson Games, Inc. was, in fact, a legitimate publisher of information to the public and Mr. Jackson would have cooperated in the investigation. Agent Foley did not know the individual Plaintiffs but did know they were users of Illuminati as he had a list of all users prior to February 28, 1990. Agent Foley did know and understand the Illuminati bulletin board would have users and probably would have stored private electronic communications between users. Notwithstanding the failure of any investigation regarding Steve Jackson Games, Agent Foley and Assistant U.S. Attorney Cook intended to seize and review all of the information and documents in any computer accessible to Blankenship, regardless of what other incidental information would be seized. These intentions were expressly stated in their application for a search warrant and the warrant itself.[4]

3. Kluepfel, Williams, Spain and Kibbler are employees of Bell South; Coutorie is a University of Texas Systems investigator assigned to investigate computer hacking; and Niedorf is a hacker involved in the Illinois bulletin board system.

4. The Court does fault Agent Foley and the Secret Service on the failure to make any investigation of Steve Jackson Games, Inc. prior to March 1, 1990, and to contact Steve Jackson in an attempt to enlist his cooperation and obtain in-

■ Foley's affidavit, executed on February 28, 1990, was sufficient under the law for the issuance of a search warrant by the United States Magistrate Judge. The Court does not find from a preponderance of the evidence that the admitted errors in Foley's affidavit were intentional and so material to make the affidavit and issuance of the warrant legally improper. *See, Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The factual errors in the affidavit include the Bell 911 document was a computer program; the Bell 911 document was engineered at a cost of $79,449; the Bell 911 document had been "slightly" edited; articles in *Phrack* were described as "hacker tutorials;" the Bell 911 document published in Phrack contained a proprietary notice; Blankenship was a computer programmer for Steve Jackson Games, Inc.; Blankenship's alias "Mentor" was listed as an Illuminati bulletin board user; Coutorie, prior to February 28, 1990, provided Foley with information on Steve Jackson Games, Inc.; and that Kluepfel had "logged" into Illuminati. The affidavit and warrant preparation was simply sloppy and not carefully done. Therefore, the Court denies the Plaintiff's contentions relating to the alleged improprieties involved in the issuance of the search warrant.

On March 1, 1990, Agents Foley and Golden executed the search warrant. At the time of the execution, each agent had available computer experts who had been flown to Austin to advise and review the stored information in the computers, the bulletin boards, and disks seized. These computer experts certainly had the ability to review the stored information and, importantly, to copy all information contained in the computers and disks within hours.

During the search of Steve Jackson Games and the seizure of the three computers, over 300 computer disks, and other materials, Agent Golden was orally advised by a Steve Jackson Games, Inc. Employee that Steve Jackson Games, Inc. was in the publishing business. Unfortunately, Agent Golden, like Foley, was unaware of the Privacy Protection Act and apparently attached no significance to this information. The evidence is undisputed that Assistant U.S. Attorney Cook would have stopped the search at the time of this notification had he been contacted.

By March 2, 1990, Agent Foley knew Steve Jackson Games, Inc. was in the publishing business and the seizure included documents intended for publication to the public, including a book and other forms of information. He also knew or had the ability to learn the seizure of the Illuminati bulletin board included private and public electronic communications and E-mail. By March 2, 1990, Agent Foley knew that Steve Jackson Games, Incorporated, and its attorneys in Dallas and Austin, were requesting the immediate return of the properties and information seized, that transcripts of publications and the back-up materials had been seized, and that the seizure of the documents, including business records of Steve Jackson Games, Inc., and their back-up was certain to economically damage Steve Jackson Games, Inc. While Agent Foley had a legitimate concern there might be some type of program designed to delete the materials, documents, or stored information he was seeking, he admits there was no valid reason why all information seized could not have been duplicated and returned to Steve Jackson Games *within a period of hours and no more than eight days* from the seizure. In fact, it was months (late June 1990) before the majority of the seized materials was returned. Agent Foley simply was unaware of the law and erroneously believed he had substantial criminal information which obviously was not present, as to date, no arrests or criminal charges have ever been filed against anyone, including Blankenship.

In addition, Agent Foley must have known his seizure of computers, printers, disks and other materials and his refusal to provide copies represented a risk of substantial harm to Steve Jackson Games, Inc.—under circum-

---

formation from him as there was never any basis to suspect Steve Jackson or Steve Jackson Games, Inc. of any criminal activity, and there could be no questions the seizure of computers, disks, and bulletin board and all information

thereon, including all back-up materials would have an adverse effect (including completely stopping all activities) on the business of Steve Jackson Games, Inc. and the users of Illuminati bulletin board.

stances where he had *no* reason to believe the corporation or its owner was involved in criminal activity.

The Secret Service denies that its personnel or its delegates read the private electronic communications stored in the seized materials and specifically allege that this information was reviewed by use of key search words only. Additionally, the Secret Service denies the deletion of any information seized with two exceptions of "sensitive" or "illegal" information, the deletion of which was consented to by Steve Jackson. However, the preponderance of the evidence, including common sense[5], establishes that the Secret Service personnel or its delegates did read all electronic communications seized and did delete certain information and communications in addition to the two documents admitted deleted. The deletions by the Secret Service, other than the two documents consented to by Steve Jackson, were done without consent and cannot be justified.

By March 2, 1990, Agent Foley, Agent Golden, and the Secret Service, if aware of the Privacy Protection Act, would have known that they had, by a search warrant, seized work products of materials from a person or entity reasonably believed to have a purpose to disseminate to the public a "book" or "similar form of public communication."

The failure of the Secret Service after March 1, 1990, to—promptly—return the seized products of Steve Jackson Games, Incorporated cannot be justified and unquestionably caused economic damage to the corporation.

By March 1, 1990, Steve Jackson Games, Incorporated was apparently recovering from acute financial problems and suffering severe cash flow problems. The seizure of the work product and delays of publication, whether by three weeks or several months, directly impacted on Steve Jackson Games, Incorporated. Eight employees were terminated because they could not be paid as revenues

from sales came in much later than expected. However, it is also clear from a preponderance of the evidence that after the calendar year 1990, the publicity surrounding this seizure and the nature of the products sold by Steve Jackson Games, Incorporated had the effect of increasing, not decreasing, sales. In fact, Steve Jackson Games, Incorporated developed a specific game for sale based upon the March 1, 1990, seizure. The Court declines to find from a preponderance of the evidence there was any economic damage to Steve Jackson Games, Incorporated after the calendar year 1990 as a result of the seizure of March 1, 1990.[6]

As a result of the seizure of March 1, 1990, and the retention of the equipment and documents seized, Steve Jackson Games, Incorporated sustained out-of-pocket expenses of $8,781.00. The personnel at this corporation had to regroup, rewrite, and duplicate substantial prior efforts to publish the book *Gurps Cyberpunk* and other documents stored in the computers and the Illuminati bulletin board, explain to their clientele and users of the bulletin board the difficulties of their continuing business to maintain their clientele, to purchase or lease substitute equipment and supplies, to re-establish the bulletin board, and to get the business of Steve Jackson Games, Inc. back in order. The Court has reviewed the evidence regarding annual sales and net income of Steve Jackson Games, Incorporated for 1990 and the years before and after and finds from a preponderance of the evidence there was a 6 percent loss of sales in 1990 due to the seizure and related problems. The evidence was undisputed that there was a 42 percent profit on sales of publications of Steve Jackson Games, Incorporated. Thus, Steve Jackson Games, Incorporated sustained damages in loss of sales in 1990 of $100,617.00 for a loss of profit of $42,259.00 as a direct and proximate result of the seizure of March 1, 1990, and the retention of the documents seized. After 1990, the net sales of Steve Jackson Games, Incorporated continued to increase annually in a traditional proportion

---

5. The application and the search warrant itself was worded by Foley and Cook so that all information would be "read" by the Secret Service.

6. The Court finds the testimony of Joanne Midwikis, an accountant who testified on behalf of Steve Jackson Games, Inc. and Steve Jackson, on damages suffered by Steve Jackson Games, Inc. and Steve Jackson was not credible.

as the sales had been increasing from 1988. Thus, from a preponderance of the evidence, the loss of $42,259.00 is consistent with the net income figures of Steve Jackson Games, Incorporated in the years immediately following and preceding 1990.

Regarding damages to Steve Jackson, personally, his own testimony is that by 1990 he was becoming more active in the management of Steve Jackson Games, Incorporated, and spending less time in creative pursuits such as writing. Steve Jackson Games, Incorporated was in such financial condition that Chapter 11 proceedings in bankruptcy were contemplated. Thereafter, the testimony clearly established that Steve Jackson Games reasserted himself in management and was spending substantial time managing the corporation. The Court declines to find from a preponderance of the evidence that Steve Jackson personally sustained any compensatory damages as a result of the conduct of the United States Secret Service.

. Elizabeth McCoy, Walter Milliken and Steffan O'Sullivan also allege compensatory damages. These Plaintiffs all had stored electronic communications, or E-mail, on the Illuminati bulletin board at the time of seizure. All three of these Plaintiffs testified that they had public and private communications in storage at the time of the seizure. Steve Jackson, Elizabeth McCoy, Walter Milliken and Steffan O'Sullivan all testified that following June of 1990 some of their stored electronic communications, or E-mail, had been deleted. It is clear, as hereinafter set out, that the conduct of the United States Secret Service violated two of the three statutes on which the causes of action of the Plaintiffs are based and, therefore, there are statutory damages involved, but the Court declines to find from a preponderance of the evidence that any of the individual Plaintiffs sustained any compensatory damages.

## II.

### a.

### PRIVACY PROTECTION ACT

(First Amendment Privacy Protection)

42 U.S.C. 2000aa et seq.

The United States Secret Service, by Agent Foley and Assistant United States Attorney Cox, sought and obtained an order from a United States Magistrate Judge to *search* for and *seize* and thereafter *read* the information stored and contained in "computer hardware (including, but not limited to, central processing unit(s) monitors, memory devices, modem(s), programming equipment, communication equipment, disks, and printers) and computer software (including, but not limited to, memory disks, floppy disks, storage media) and written material and documents relating to the use of the computer system (including network access files), documentation relating to the attacking of computers and advertising the results of computer attacks (including telephone numbers and location information), and financial documents and licensing documentation relative to the computer programs and equipment at the business known as Steve Jackson Games which constitute evidence, instrumentalities, and fruits of federal crimes, including interstate transportation of stolen property (18 U.S.C. 2314) and interstate transportation of computer access information (18 U.S.C. 1030(a)(6))." *See*, Warrant Application and Order.

On March 1, 1990, the Secret Service seized the following property on the premises of Steve Jackson Games, Inc.: Compuadd keyboard; Packard–Bell monitor; DKT computer; cardboard box containing disks, miscellaneous papers and circuit boards; Splat Master gun with "Mentor" on barrel; Hewlett–Packard laser jet printer; BTC keyboard with cover; IBM personal computer 5150 (disassembled); Seagate Tech hard disk; 2400 modem 1649–1795 with power supply and disk; IBM keyboard; Amdek mode 310A; bulletin board back-up files (approximately 150); Empac International Corporation XT computer; "WWIV" users manual; red box of floppy disks; miscellaneous papers and notes from desk; floppy disk entitled "Phoenix setup." *See*, Warrant Return.

The evidence establishes the actual information seized, including both the primary source and back-up materials of the draft of *Gurps Cyberpunk*, a book intended for immediate publication (within days to weeks), drafts of magazines and magazine articles to

be published, business records of Steve Jackson Games, Incorporated (including contracts and drafts of articles by writers of Steve Jackson Games, Incorporated), the Illuminati bulletin board and its contents (including public announcements, published newsletter articles submitted to the public for review, public comment on the articles submitted and electronic mail containing both private and public communications). Notwithstanding over 300 floppy disks being seized, the evidence introduced during trial was not clear as to what additional information was seized during the search warrant execution. However, the evidence is clear that on March 1, 1990, "work product materials," as defined in 42 U.S.C. 2000aa–7(b), were obtained as well as materials constituting "documentary materials" as defined in the same provision.[7]

The Privacy Protection Act, 42 U.S.C. 2000aa, dictates: "Notwithstanding any other law, it shall be unlawful for a government officer or employee, in connection with the investigation ... of a criminal offense to search for or seize any work product materials possessed by a person reasonably believed to have a purpose to disseminate to the public a newspaper, broadcast, or other similar form of public communication...." See, 42 U.S.C. § 2000aa(a).

Assuming Agent Foley was knowledgeable of the Privacy Protection Act (which he was not), neither he nor Assistant United States Attorney Cox had any information which would lead them to believe that Steve Jack-

son Games, Incorporated published books and materials and had a purpose to disseminate to the public its publications. Their testimony is simply they thought it a producer of games. As heretofore stated, the Court feels Agent Foley failed to make a reasonable investigation of Steve Jackson Games, Incorporated when it was apparent his intention was to take substantial properties belonging to the corporation, the removal of which could have a substantial effect on the continuation of business. Agent Foley, it appears, in his zeal to obtain evidence for the criminal investigation, simply concluded Steve Jackson Games, Incorporated was somehow involved in Blankenship's alleged activities because of the wording of the Illuminati bulletin board menu. In any event, the Court declines to find from a preponderance of the evidence that on March 1, 1990, Agent Foley or any other employee or agent of the United States had reason to believe that property seized would be the work product materials of a person believed to have a purpose to disseminate to the public a newspaper, book, broadcast or other similar form of public communication.[8]

■ During the search on March 1, and on March 2, 1990, the Secret Service was specifically advised of facts that put its employees on notice of probable violations of the Privacy Protection Act. It is no excuse that Agents Foley and Golden were not knowledgeable of the law. On March 2, 1990, and thereafter, the conduct of the United States

---

7. If the Secret Service, in the performance of executing Court order, had only obtained and taken the 911 document or alleged decryption materials, application of the definitions of "documentary materials" and "work product materials" would logically result in no violation of the statute under the circumstances of this case. It was the seizing all documents and information and, thereafter, the failure to promptly return the information seized which leads to violation of the statute.

8. The legislative history to the Privacy Protection Act states:
   ... the Committee recognized a problem for the law enforcement officer, who seeking to comply with the statute, might be uncertain whether the materials he sought were work product or nonwork product and that they were intended for publication. Therefore, in the interests of allowing for some objective measure for judgment by the office, the Committee has provided that the work product

must be possessed by someone "reasonably believed" to have a purpose to communicate to the public.
S.Rep. No. 874, 96th Cong., 2nd Sess., 10 (1980), reprinted in 1980 U.S.C.C.A.N. 3950, 3957. As the Court has stated, Agent Foley with only a few hours of investigation would have "reasonably believed" Steve Jackson Games, Incorporated had "a purpose to communicate to the public." Therefore, under an objective standard, assuming a reasonable investigation, Agent Foley and the Secret Service violated the statute on March 1, 1990. However, Agent Foley was not aware of the Privacy Protection Act and was therefore not "seeking to comply" with its requirements. Consequently, the Court found on March 1, 1990 neither Agent Foley nor any other employee or agent of the United States "reasonably believed" the materials seized were work product or Steve Jackson Games, Incorporated had a "purpose to disseminate to the public."

Secret Service was in violation of 42 U.S.C. 2000aa *et seq.* It is clear the Secret Service continued the seizure of property of Steve Jackson Games, Incorporated including information and documents through late June of 1990. Immediate arrangements could and should have been made on March 2, 1990, whereby copies of all information seized could have been made. The government could and should have requested Steve Jackson as chief operating officer of the corporation to cooperate and provide the information available under the law. The Secret Service's refusal to return information and property requested by Mr. Jackson and his lawyers in Dallas and Austin constituted a violation of the statute. Regarding any information seized that would constitute "documentary materials" (whereby the defensive theory of 42 U.S.C. 2000aa(b)(3) might apply) there would have been no problem as the property was in the possession of the United States Secret Service and their experts and Steve Jackson were present to ensure no destruction, alteration or concealment of information contained therein. In any event, it is the seizure of the "work product materials" that leads to the liability of the United States Secret Service and the United States in this case. Pursuant to 42 U.S.C. 2000aa–6, the Court finds from a preponderance of the evidence that Steve Jackson Games, Incorporated is entitled to judgment against the United States Secret Service and the United States of America for its expenses of $8,781.00 and its economic damages of $42,259.00. The Court declines to find from a preponderance of the evidence other damages of Steve Jackson Games, Incorporated or liability of the United States Secret Service or the United States of America to any other Plaintiff under the provisions of the Privacy Protection Act.

b.

### WIRE AND ELECTRONIC COMMUNICATIONS INTERCEPTION

### AND INTERCEPTION OF ORAL COMMUNICATIONS

18 U.S.C. 2510 et seq.

■ The Plaintiffs allege the United States Secret Service's conduct also violated 18 U.S.C. 2510, *et seq.*, as it constituted intentional interceptions of "electronic communication." They allege the interception occurred at the time of seizure or, perhaps, at the time of review of the communication subsequent to the seizure. There is no question the individual Plaintiffs had private communications stored in Illuminati at the time of the seizure and the court has found from a preponderance of the evidence the Secret Service intended not only to seize and read these communications, but, in fact, did read the communications and thereafter deleted or destroyed some communications either intentionally or accidentally. The Defendants contend there is no violation of this particular statute under the facts of this case because there never was any unlawful "interception" within the meaning of the statute. Alternatively, the Defendants contend that the "good faith reliance" on the search warrant issued by the United States Magistrate Judge is a complete defense under Section 2520.

The Government relies on the 1976 Fifth Circuit case of *United States v. Turk,* 526 F.2d 654 (5th Cir.1976), *cert. denied,* 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976), and its interpretation of the statutory definition of "interception." In *Turk,* police officers listened to the contents of a cassette tape without first obtaining a warrant. The court concluded this was not an "interception" under 18 U.S.C. § 2510 et seq.

> Whether the seizure and replaying of the cassette tape by the officers was also an "interception" depends on the definition to be given "aural acquisition." Under one conceivable reading, and "aural acquisition" could be said to occur whenever someone physically hears the contents of a communication, and thus the use of the tape player by the officers to hear the previously recorded conversation might fall within the definition set out above. No explicit limitation of coverage to contemporaneous "acquisitions" appears in the Act.
>
> We believe that a different interpretation—one which would exclude from the definition of "intercept" the replaying of a previously recorded conversation—has a

much firmer basis in the language of § 2510(4) and in logic, and corresponds more closely to the policies reflected in the legislative history. The words "acquisition ... through the use of any ... device" suggest that the central concern is with the activity engaged in at the time of the oral communication which causes such communication to be overheard by uninvited listeners. If a person secretes a recorder in a room and thereby records a conversation between two others, an "acquisition" occurs at the time the recording is made. This acquisition itself might be said to be "aural" because the contents of the conversation are preserved in a form which permits the later aural disclosure of the contents. Alternatively, a court facing the issue might conclude that an "aural acquisition" is accomplished only when two steps are completed—the initial acquisition by the device and the hearing of the communication by the person or persons responsible for the recording. Either of these definitions would require participation by the one charged with an "interception" in the contemporaneous acquisition of the communication through the use to the device. The argument that a new and different "aural acquisition" occurs each time a recording of an oral communication is replayed is unpersuasive. That would mean that innumerable "interceptions," and thus violations of the Act, could follow from a single recording.

*Id.*, at 657–658 (footnotes omitted). While the Fifth Circuit authority relates to the predecessor statute, Congress intended no change in the existing definition of "intercept" in amending the statute in 1986. *See,* S.Rep. No. 541, 99th Cong., 2nd Sess. 13 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3555, 3567 ("Section 101(a)(3) of the ELECTRONIC COMMUNICATIONS PRIVACY ACT amends the definition of the term "intercept" in current section 2510(4) of title 18 to cover electronic communications. The definition of "intercept" under current law is retained with respect to wire and oral communications except that the term "or other" is inserted after "aural." This amendment clarifies that it is illegal to intercept the non-voice portion of a wire communication."). The Court finds this argument persuasive when considering the Congressional enactment of the Stored Wire and Electronic Communications and Transactional Records Access Act, 18 U.S.C. 2701, *et seq.*

The Court declines to find liability for any Plaintiff against the Defendants pursuant to the Wire and Electronic Communications Interception and Interception of Oral Communications Act, 18 U.S.C. 2510, *et seq.,* and specifically holds that the alleged "interceptions" under the facts of this case are not "interceptions" contemplated by the Wire and Electronic Communications Interception and Interception of Oral Communications Act. It simply has no applicability to the facts of this case.

c.

## STORED WIRE AND ELECTRONIC COMMUNICATIONS

## AND TRANSACTIONAL RECORDS ACCESS

### 18 U.S.C. § 2701 et seq.

▮ Prior to February 28, 1990, Agent Foley, Assistant United States Attorney Cox, and the computer consultants working with them were cognizant of public computer bulletin boards and the use of electronic communications and E-mail through them. Each of the persons involved in this investigation, including Agent Foley, had the knowledge and opportunity to log into the Illuminati bulletin board, review its menu and user lists, obtain passwords, and thereafter review all information available to the public. In fact, Agent Foley erroneously thought Kluepfel had done this when a printout of Illuminati documents dated February 25, 1990, was received. When Foley applied for the search warrant on February 28, 1990, he knew the Illuminati bulletin board provided services to the public whereby its users could store public and private electronic communications. While Foley admits no knowledge of the Privacy Protection Act and its provisions protecting publishers of information to the public, he testified he was knowledgeable regarding the Wire and Electronic Communications Interception and Interception of Oral Communications Act. But, Foley never

thought of the law's applicability under the facts of this case. Steve Jackson Games, Inc., through its Illuminati bulletin board services, was a "remote computing service" within the definition of Section 2711, and, therefore, the only procedure available to the Secret Service to obtain *"disclosure"* of the contents of electronic communications was to comply with this statute. *See,* 18 U.S.C. 2703. Agent Foley and the Secret Service, however, wanted more than "disclosure" of the contents of the communication. As the search warrant application evidences, the Secret Service wanted *seizure* of all information and the authority to review and read all electronic communications, both public and private. A court order for such disclosure is only to issue if "there is a reason to believe the contents of a[n] ... electronic communication ... are relevant to a legitimate law enforcement inquiry." *See,* 18 U.S.C. § 2703(d). Agent Foley did not advise the United States Magistrate Judge, by affidavit or otherwise, that the Illuminati bulletin board contained private electronic communications between users or how the disclosure of the content of these communications could relate to his investigation. Foley's only knowledge was that Blankenship had published part of the 911 document and decryption information in his Phoenix bulletin board, was employed at Steve Jackson Games, Inc., and could have the ability to store and delete these alleged unlawful documents in the computers or Illuminati bulletin board at Steve Jackson Games, Incorporated. At Agent Foley's specific request, the application and affidavit for the search warrant were sealed. The evidence establishes the Plaintiffs were not able to ascertain the reasons for the March 1, 1990 seizure until after the return of most of the property in June of 1990, and then only by the efforts of the offices of both United States Senators of the State of Texas. The procedures followed by the Secret Service in this case virtually eliminated the safeguards contained in the statute. For example, no Plaintiff was on notice that the search or seizure order was made pursuant to this statute and that Steve Jackson Games, Incorporated could move to quash or modify the order or eliminate or reduce any undue burden on it by reason of

the order. *See,* 18 U.S.C. § 2703(d). The provisions of the statute regarding the preparation of back-up copies of the documents or information seized were never utilized or available. *See,* 18 U.S.C. § 2704. Agent Foley stated his concern was to prevent the destruction of the documents' content and for the Secret Service to take the time necessary to carefully review all of the information seized. He feared Blankenship could possibly delete the incriminating documents or could have programmed destruction in some manner. Notwithstanding that any alteration or destruction by Blankenship, Steve Jackson, or anyone else would constitute a criminal offense under this statute, Foley and the Secret Service seized—not just obtained disclosure of the content—all of the electronic communications stored in the Illuminati bulletin board involving the Plaintiffs in this case. This conduct exceeded the Government's authority under the statute.

The Government Defendants contend there is no liability for alleged violation of the statute as Foley and the Secret Service had a "good faith" reliance on the February 28, 1990, court order/search warrant. The Court declines to find this defense by a preponderance of the evidence in this case.

■ Steve Jackson Games, Incorporated, as the provider and each individual Plaintiffs as either subscribers or customers were "aggrieved" by the conduct of the Secret Service in the violation of this statute. While the Court declines to find from a preponderance of the credible evidence the compensatory damages sought by each Plaintiff, the Court will assess the statutory damages of $1,000.00 for each Plaintiff.

### III. SUMMARY

This is a complex case. It is still not clear how sensitive and/or proprietary the 911 document was (and is) or how genuinely harmful the potential decryption scheme may have been or if either were discovered by the Secret Service in the information seized on March 1, 1990. The fact that no criminal charges have ever been filed and the investigation remains "on going" is, of course, not conclusive.

The complexity of this case results from the Secret Service's insufficient investigation and its lack of knowledge of the specific laws that could apply to their conduct on February 28, 1990 and thereafter. It appears obvious neither the government employees nor the Plaintiffs or their lawyers contemplated the statute upon which this case is brought back in February, March, April, May or June of 1990. But this does not provide assistance to the defense of the case. The Secret Service and its personnel are the entities that citizens, like each of the Plaintiffs, rely upon and look to protect their rights and properties. The Secret Service conduct resulted in the seizure of property, products, business records, business documents, and electronic communications of a corporation and four individual citizens that the statutes were intended to protect.

It may well be, as the Government Defendants contend, these statutes relied upon by the Plaintiffs should not apply to the facts of this case, as these holdings may result in the government having great difficulties in obtaining information or computer documents representing illegal activities. But this Court cannot amend or rewrite the statutes involved. The Secret Service must go to the Congress for relief. Until that time, this Court recommends better education, investigation and strict compliance with the statutes as written.

The Plaintiffs are ordered to submit application for attorney's fees and costs with appropriate supporting affidavits within ten (10) days of the date of this order. The Defendants will have ten days thereafter to file their responses.