# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 03-2658

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

EDWIN OLIVA,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 CR 275—**Blanche M. Manning**, *Judge.*

———————

ARGUED FEBRUARY 10, 2004—DECIDED OCTOBER 13, 2004

———————

Before RIPPLE, ROVNER, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Edwin Oliva was caught attempting to sell two kilos of cocaine to a confidential informant. He pleaded guilty to conspiracy to possess and distribute more than 500 kilograms of cocaine. Oliva's plea agreement reserved the right to appeal the district court's denial of his motion to suppress his arrest and the search of his car. Because we find that the arrest and subsequent search were supported by probable cause, we affirm the conviction.

**I**

On March 21, 2002, Drug Enforcement Agency agents received a tip alerting them to Oliva's drug business. A confidential informant told the agents that he had ordered cocaine from a male Hispanic named "Edwin" before, and that Edwin would sell him up to five kilograms of cocaine. With the informant's cooperation, the agents had the informant set up a deal with Edwin. Agents recorded more than four conversations between the informant and Edwin and the two finally agreed that Edwin would bring two kilos of cocaine to the informant at his apartment for $40,000.

The drug deal was to take place at 3 p.m. on March 22, 2002. Agents set up surveillance around the informant's apartment. At around 2:55 p.m., agents observed a tan Kia Sephia occupied by two Hispanic males arrive in the area of the informant's apartment. The car stopped briefly in front of the informant's apartment and then parked a couple of blocks away.

The men got out of the car and walked toward the informant's apartment. The informant telephoned an agent and told him that he recognized the driver of the car as "Edwin," later identified as Oliva. The informant also told the agent that he did not know the man with Oliva and that he was afraid that because Oliva had someone with him that the two men would be armed. The informant reported that he was nervous about getting into the car with Oliva to complete the drug deal.

As Oliva and the other man, later identified as Edward Mejia, reached the door, the agents approached, identified themselves as police, activated emergency lights in their cars, and drew their weapons. The agents asked the men to put their hands in the air. Both men refused. Worse, Oliva put his hand down the front of his waistband where agents noticed a gun. Mejia appeared to have a gun as well. The police then rushed the men and after a brief scuffle placed

them both in custody. The police recovered loaded 9mm semi-automatic handguns from both Mejia and Oliva.

As the arrests were taking place, the agents left in charge of watching the Kia placed a call to a canine unit to search for the presence of drugs in the car. No cocaine was found on either Oliva or Mejia, but the informant had stated that Oliva drove a car with a trap compartment. On arrival, Duke, a drug-sniffing dog, alerted to the passenger-side door and, once inside the Kia, to the passenger-side air-bag compartment. Agents discovered the air-bag compartment was a trap containing almost two kilos of cocaine.

Oliva and Mejia were indicted on June 19, 2002, on one count of conspiracy to distribute and to possess with intent to distribute more than 500 grams of cocaine, in violation of 21 U.S.C. § 846 (Count I), one count of possessing more than 500 grams of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (Count II), and one count of carrying and using a firearm during the commission of a controlled substance offense, in violation of 18 U.S.C. § 924(c) (Count III). Oliva filed motions to suppress both the warrantless search and warrantless arrest. He argued that the agents lacked probable cause to arrest him, claiming that the informant had not provided enough information about the deal and that the agents had failed to corroborate independently the details the informant provided. With respect to the search of the car, Oliva argued that it was undertaken before the drug-sniffing dog arrived on the scene and that the agents lacked probable cause. The district court initially denied an evidentiary hearing on both motions, but later granted a hearing on the motion to suppress the results of the search, based on some confusion as to when the dog sniff took place and when the agents entered the car.

On February 10, 2003, following the evidentiary hearing, the district court denied both motions to suppress. The court found that the police had sufficient confirmation of

the information provided by the informant to give them probable cause to arrest both men. The court also found that the dog sniff provided probable cause to search Oliva's car for drugs.

Oliva entered a conditional guilty plea to Counts I and III, preserving his ability to appeal the district court's denial of the motions to suppress. The government dismissed Count II. The district court sentenced Oliva on June 10, 2003, to the mandatory minimum sentence of 60 months on Count I and to the mandatory consecutive sentence of 60 months on Count III, to be followed by five years of supervised release. Oliva contests the district court's denial of both his motions to suppress.

## II

### A

The district court found that the agents' stop of Oliva was supported by probable cause. We review the determination *de novo*, although we review findings of fact for clear error and give due weight to inferences drawn from those facts by the district court and law enforcement. See *Ornelas v. United States*, 517 U.S. 690, 699 (1996).

"In order to make an arrest without a warrant, the police must have probable cause, under the totality of the circumstances, to reasonably believe that a particular individual has committed a crime." *United States v. Gilbert*, 45 F.3d 1163, 1166 (7th Cir. 1995). We assess the determination of probable cause for a search or an arrest under the common-sense "totality of the circumstances" analysis established in *Illinois v. Gates*, 462 U.S. 213 (1983), which requires us to decide "whether, given all of the circumstances set forth . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238; see *Gilbert*, 45 F.3d at 1166.

An informant's tip, if reliable, is considered trustworthy information. See *United States v. Scott*, 19 F.3d 1238, 1242 (7th Cir. 1994). The district court is required to consider the informant's information in light of how detailed it is, how reliable it is, and to what degree it is corroborated by other information available to the officers. *United States v. Navarro*, 90 F.3d 1245, 1253 (7th Cir. 1996). An unverified tip from a known informant must be judged, like all other information supporting a search, in light of the totality of the circumstances.

On appeal, Oliva argues that the tip the police received from the informant was not reliable because the police did not know the informant before the initial tip, because actual events contradicted the informant's information, and because the police failed to corroborate any of the informant's information.

Although the police did not know the informant before the initial phone call, that alone does not make the informant's information unreliable. It means at most that the agents might need to do more work to verify the information given by the informant, which the agents did in this case. Oliva maintains that the police did not independently verify the informant's information, but this does not do them justice. In fact, before stopping Oliva, the agents observed him taking the actions which the informant had said to expect. That is exactly the type of corroboration that counts. See *Navarro*, 90 F.3d at 1254 ("[B]ecause the surveillance preceding the stop corroborated the information from the informant, the law enforcement officers had probable cause for both the arrest and search"); *Alabama v. White*, 496 U.S. 325, 329 (1990) (stating that if "an informant is shown to be right about some things, he is probably right about other facts that he has alleged, including the claim that the object of the tip is engaged in criminal activity.").

Unfortunately for Oliva, "everything transpired as the informant described." *Navarro*, 90 F.3d at 1253. The initial set-up of the drug deal was done under the direction of the

agents themselves—this was not a situation where an informant informed agents of an already scheduled deal. The informant told police that his dealer was a Hispanic male named Edwin. At the pre-arranged time, agents observed a Hispanic male drive to the informant's house, stop briefly, then park. The Hispanic male got out of the car, with another man, and walked to the informant's home. At that time, the informant phoned an agent and identified the Hispanic male as Edwin, his drug dealer. The police verified each piece of the informant's information by observing it happen. When events unfolded as predicted, the police had all the corroboration they required. Actual events did not contradict any aspect of the informant's information. At worst, the informant gave incomplete information: the informant did not say anything about the kind of car Oliva would drive or that Oliva would bring another person along on the deal. On the other hand, the informant never said anything inconsistent with those details. The informant's information, coupled with the corroboration the police observed as the deal unfolded, gave the police reasonable suspicion to believe Oliva possessed cocaine that he intended to sell to the informant. See *United States v. Herrara*, 54 F.3d 348, 355 (7th Cir. 1995).

**B**

Oliva also contends that the search of his car, with the assistance of the trained dog, was undertaken without probable cause. Oliva theorizes that the police entered his car before the drug-sniffing dog arrived, because one of the police reports shows that the dog sniff occurred at 16:15 hours (4:15 p.m.), nearly one hour after the drugs were removed from the car. Except for that one entry on the police report, which the district court found to be a typo, all the remaining evidence contradicts Oliva's theory. The district court heard testimony from two officers who were

present before the sniff, during the sniff, and then during the subsequent search. The agents testified that they observed Oliva's Kia from the time he parked it until the search. Both agents testified that no one entered the Kia until the dog handler arrived.

Oliva argues that it would be physically impossible for all the events to take place as alleged. Two phone calls book-end the start of the arrest and the discovery of the drugs, the first call at 3:05 and the last at 3:20, leaving only 15 minutes to arrest Oliva, call the handler, wait for the handler, have the dog alert, and then locate the drugs in the car. Oliva finds support for his argument in the time estimates given by the agents during the hearing—that they waited ten to fifteen minutes for the dog, or that the arrest took five minutes. The agents did testify, however, that events moved very quickly and that they had no real idea how long things took to unfold. Oliva also overlooks the fact that because police had alerted the dog handler before the arrest that they would need a drug-sniffing dog, the handler might have been very close by when he received the call.

The district court credited the testimony of the agents over the time recorded on one police report. Ultimately, that is a credibility determination, one which we will overturn only if it is completely without foundation. *United States v. Salyers*, 160 F.3d 1152, 1162 (7th Cir. 1998). Although we agree with Oliva that things happened very quickly, they were not so fast as to be physically impossible. Without more, we will not disturb the district court's determination.

### III

We therefore affirm the district court's orders denying both of Oliva's motions to suppress, and thus we AFFIRM the judgment of the district court.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*