In the

# United States Court of Appeals
## For the Seventh Circuit

No. 08-4180

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DAJUAN R. BOOKER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 CR 182—**James B. Zagel**, *Judge*.

ARGUED FEBRUARY 19, 2010—DECIDED JULY 14, 2010

Before POSNER, FLAUM, and WOOD, *Circuit Judges*.

FLAUM, *Circuit Judge*. Dajuan Booker appeals from a conviction for possession with intent to distribute more than 50 grams of crack. He challenges the district court's finding that officers had probable cause to search his truck and arrest him following a tip from a confidential source. Booker also claims that the trial judge committed a procedural error during sentencing by combining a mandatory minimum sentence for the

drug offense with that for a gun charge on which Booker was acquitted. Appellant's contentions lack merit and we now affirm.

## I. Background

On October 21, 2003, a confidential source (the "CS") who had previously been charged with a drug offense agreed to cooperate with law enforcement to secure more lenient treatment. He told Drug Enforcement Administration ("DEA") investigators that on several prior occasions, he had purchased anywhere from nine ounces to half a kilogram of crack cocaine from one "Big Moe," and was expecting to buy another half kilogram on October 22 for $10,500. As is often the case in drug transactions, the CS did not know many personal details about his business partner but believed that Big Moe's last name may have been Booker and that Big Moe may have resided on School Street in Riverdale, Illinois. The CS provided a cell phone number for Booker, explained what Booker looked like (black male, approximately 35 years old, around 5'9", weighing about 300 lbs), and stated that he drove a black Ford Harley-Davidson-model pick-up truck.

The DEA proceeded to investigate the identity of Big Moe. They contacted the Riverdale Police Department and learned that a person named Dajuan Booker had some connections to School Street. Agents ran a criminal history check that revealed that Dajuan Booker used a School Street address. Finally, the DEA obtained a driver's license photograph of Booker from the Illinois Secretary of State. The CS identified the man in the photograph as

Big Moe. All of these events transpired in the span of several hours—the agency moved quickly to convert its source's previously scheduled October 22 exchange into a controlled buy.

The next morning, the DEA set up surveillance near the School Street address linked to Booker and began recording conversations. First, the CS called Booker and left a message. A few minutes later, the CS received a call back from a different number from a man who identified himself as "Moe." Moe said he was "ready." Based on four years' worth of drug-enforcement experience, one of the agents interpreted the remark to mean that Moe was ready to deliver narcotics. The CS then proceeded to negotiate about the meeting location. The CS first proposed his mother's house and a nearby club called Arnie's, but Moe refused, explaining that there had recently been a shooting at Arnie's and the place was "hot." The two men then agreed to meet at "the house" in about an hour. The conversation did not feature many descriptive nouns. Instead, most remarks were similar in form to "Uh, then we gonna get ready and then I'll just call ya when I get where I'm going. Then you just come over. You know how to get to [unintelligible]."[1]

An hour after the second conversation, Moe called the CS. The CS asked if Moe "got it ready already." Moe said he did and agreed to call the CS when he was

---

[1] This phrase was utterred during the first conversation but contains approximately the same level of detail as all of the other exchanges recorded by the DEA.

pulling in. Two more calls followed, both discussing the meeting time.

The DEA intended to arrest Booker as soon as he arrived. It did just that when a black, Harley-Davidson-model Ford truck arrived at the School Street address approximately twenty-five minutes after the last call. Four agents approached the vehicle and ordered the driver out. When they saw that he matched the photographs of Booker, they handcuffed him and patted him down, but did not find any contraband on his person. The agents took Booker into custody and used his keys to open the truck bed, which contained a gray bag full of crack cocaine. The agents told Booker that he was under arrest for possession of a controlled substance and read Booker his *Miranda* rights. Booker then signed a form listing those same rights.

The DEA took Booker to a police station, where he agreed to make incriminating statements. He explained the School Street house belonged to his aunt and that he lived in an apartment at another location. He admitted that he had a variety of drugs and drug-making equipment at the apartment and gave written consent for agents to search it. The DEA also checked the license plates of his truck and found out that it was registered to Al Brown, who lived at the School Street address. When agents could not reach Brown, they detained the truck and transported it to an impound lot. During a subsequent inventory search, they found a loaded revolver in the rear center console of the vehicle.

Booker was tried on four counts: two counts of possession with intent to distribute in excess of 50 grams of

cocaine base; one count of possession of a firearm in relation to a drug-trafficking crime; and one count of possession of a firearm by a convicted felon, which was subsequently severed by the district court. Appellant made several pre-trial motions, including a motion to suppress evidence on the grounds that agents lacked probable cause to arrest him, but the district court denied relief. Booker was then convicted on the two drug charges. The district court declared a mistrial on the remaining weapons charge.

At sentencing, the Probation Office classified Booker as a career offender on the basis of several prior state convictions. The Presentence Investigation Report ("PSR") thus identified a guideline sentencing range of 360 months to life. Booker did not object to this recommendation. Instead, he asked that the court instead deviate downwards and impose the mandatory minimum 20-year sentence based on favorable 18 U.S.C. § 3553(a) factors. After a lengthy colloquy, the district court considered Booker's extensive efforts to rehabilitate himself since his arrest and imposed a 25-year sentence. The court reasoned, in part, that Booker almost certainly possessed a weapon, which would have been associated with a 60-month sentence. It added those 60 months to the 240 months mandated by statute to arrive at 25 years.

Defendant-appellant now argues that because the DEA lacked probable cause to arrest him and search his truck, the district court erred in denying his motion to suppress evidence. Booker also claims that the district court committed a procedural error when he imposed

the 25-year sentence without adequately considering 18 U.S.C. § 3553(a) factors. Finally, Booker argues that the addition of 60 months to the mandatory minimum sentence amounted to a judicial conviction on the gun charge in violation of his Sixth Amendment right to a trial by jury.

## II. Discussion

A.   Motion to Suppress

When we review a district court's denial of a motion to suppress evidence, we examine legal issues de novo and check conclusions of fact for clear error. *United States v. Jackson*, 300 F.3d 740, 745 (7th Cir. 2002). Determinations of the existence of probable cause are mixed questions of law and fact that are entitled to de novo review. *United States v. Zahursky*, 580 F.3d 515, 521 (7th Cir. 2009).

Probable cause exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. United States*, 517 U.S. 690, 696 (1996). The Supreme Court has recognized that when probable cause exists to search an automobile, officers are permitted to conduct a warrantless search of "all parts of the vehicle in which contraband or evidence could be concealed, including closed compartments and trunks." *United States v. Young*, 38 F.3d 338, 340 (7th Cir. 1994) (citing *California v. Acevedo*, 500 U.S. 565 (1991); *Carroll v. United States*, 267 U.S. 132, 153-56 (1925)). "[D]etermining whether probable cause

exists involves a 'practical, common-sense decision whether, given all the circumstances set forth . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Ellis*, 499 F.3d 686, 689 (7th Cir. 2007) (ellipsis in original).

The circumstances of Booker's case pass this test. The DEA received a specific tip from an informant about Booker's participation in the drug trade from a source who had bought drugs from the suspect on several prior occasions. The agency then collected corroborating information for this tip in the form of Booker's prior convictions for drug trafficking. Next, agents listened to conversations where the informant and Booker struck a deal to purchase a large quantity of crack. Though Booker himself appears to have never uttered the word "crack" or a similar descriptive term, the logistics of the transaction (in particular, the diligence with which the parties coordinated the timing and location of their meeting) made the conclusion that drugs were being sold reasonable. The CS told agents that he had previously bought drugs from Booker. The familiar tone of the conversations between the two confirmed these accounts, as did the men's mutual, precise understanding of the otherwise-opaque term "the house."

When Booker showed up in a vehicle matching the description provided by the CS at the time the CS identified on the phone, agents had sufficient evidence to conclude that there was a fair probability the suspect was in possession of the large quantity of crack he was supposed to sell, either on his person or in his truck.

Booker's arrest and the search of his vehicle were therefore valid. *See, e.g.*, *United States v. Zahursky*, 580 F.3d 515 (7th Cir. 2009). In *Zahursky*, we found that Secret Service agents had probable cause to search the car of a suspect who arrived at a Valparaiso, Indiana, Starbucks to meet an undercover detective whom he believed was an underage girl seeking out sex. Zahursky's vehicle and outfit matched the description he provided to "Shelly" over the internet; he also arrived at the right time. Because the suspect resided nearly 150 miles away in Lexington, Illinois, we determined that officers could reasonably expect to find evidence of his intent to cross state lines or have intercourse in the car. The inference was strengthened by the Zahursky's promise to bring along condoms and lubricant, which he was unlikely to carry into the public café. The confirmatory details available to the officers in this case were similarly sufficient for a finding of probable cause.

Booker nonetheless argues that officers had only a raw suspicion that drugs were about to change hands and lacked enough particularized information to reasonably expect to find contraband in his truck. Appellant thus takes issue with the credibility of the CS, claiming that he lacked a prior history of accurate tips and that his tip was not nearly as detailed as that in *Illinois v. Gates*, 462 U.S. 213 (1983) (finding probable cause where informant provided a detailed description of a scheme to move drugs from Florida to Illinois) or *United States v. Rosario*, 234 F.3d 347 (7th Cir. 2000). Booker exaggerates the difference between the facts at hand and in *Rosario* (where we found probable cause for a search based in

part on the tip of a first-time informant who only knew the defendant's nickname and some other potential aliases), *id.* at 351, but that does not matter because we look to the totality of circumstances when evaluating probable cause. *Gates*, 462 U.S. at 238.

Booker correctly points out that the CS was unable to predict many aspects of the transaction, such as where the drugs could be found, the form of payment Booker expected to receive in exchange for the drugs (though presumably drug dealers rarely accept credit cards or personal checks), or whether anyone else would be involved in the transaction. Appellant asserts that the CS did not anticipate exchanging drugs at the house because he proposed two other locations, and that the phone conversations never explicitly revealed that Booker was getting drugs ready, as opposed to some other substance. Finally, he argues that there was nothing suspicious about Booker pulling up to a house that could well have been his in a car that the officers had every reason to believe Booker owned. These gaps and doubts existed here as they do in countless criminal investigations. We have not held them to preempt a finding of probable cause on prior occasions, *see, e.g.*, *United States v. Oliva*, 385 F.3d 1111, 1115 (7th Cir. 2004); *United States v. Huebner*, 356 F.3d 807, 816 (7th Cir. 2004), and see no reason to deviate from this precedent today. *See also United States v. Ganser*, 315 F.3d 839, 843 (7th Cir. 2003) ("If an informant is shown to be right about some things, he is probably right about other facts that he has alleged, including the claim that the object of the tip is engaged in criminal activity.") (citations omitted).

Overall, Booker argues that everything the DEA knew when they arrested Booker was consistent with inno-cent behavior and nothing more. Part of that contention is correct but carries limited weight, since probable cause does not demand virtual certainty that illegal behavior is transpiring. The possibility of an innocent explanation does not vitiate properly established prob-able cause. Here, the totality of the information available to the DEA fully supported the inference that Booker was a drug dealer because a prior buyer identified Booker as such, Booker's background matched this oc-cupation, and Booker agreed to sell drugs to the buyer in a recorded phone call. For these reasons, we conclude that the DEA had probable cause to search Booker and his truck as soon as he arrived at the School Street address.[2]

B.  Procedural Unreasonableness of Booker's Sentence

We review whether the district court followed proper procedures at sentencing de novo. *United States v. Hurt*, 574 F.3d 439, 442 (7th Cir. 2009). Pursuant to *Gall v. United States*, 552 U.S. 38, 49 (2007), the district court must begin by looking at the guidelines range. It must then hear the arguments of the parties and conclude by making an individualized assessment of the appropriate sentence based on the § 3553(a) factors. *Id.* at 49-50.

---

[2] We need not reach the question of whether the "inevitable discovery" doctrine also applies to the evidence found in Booker's truck.

"Judges need not rehearse on the record all of the considerations that 18 U.S.C. § 3553(a) lists; it is enough to calculate the range accurately and explain why (if the sentence lies outside it) this defendant deserves more or less." *United States v. George*, 403 F.3d 470, 472-73 (7th Cir. 2005).

Appellant argues that his sentence is procedurally unreasonable because to select a 25-year term of imprisonment, the district court combined the mandatory term for the drug offenses with the length of incarceration that would have been required if Booker was found guilty of the weapons charge. Appellant asserts that the district court did not provide a reasoned explanation for why it was adding the sixty months associated with the latter to the 240 months associated with the former, attributing to the district court only a brief comment about how he was "quite sure the defendant did possess a weapon." Accordingly, Booker claims, the court failed to carry out the analysis required by 18 U.S.C. § 3553(a).

The government correctly points out, however, that Booker's potential possession of a gun was a circumstance of the offense within the ambit of 18 U.S.C. § 3553(a)(1). Furthermore, Booker grossly mischaracterizes the extent and depth of the district court's sentencing discussion. The record shows that the court carefully considered, among other factors, the guidelines range, Booker's own arguments, Booker's family history, and the impact that various sentences could have on defendant's rehabilitation. It then handed down a below-guidelines sentence. The decision to do so was proce-

durally sound. *See* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."); *cf. United States v. Brown*, No. 09-1028, 2010 U.S. App. LEXIS 12212 (7th Cir. June 15, 2010) (remanding for rehearing a sentence where overwhelmingly negative remarks by the district court created a gap between the apparent characteristics of the defendant and his lenient sentence that this Court was unable to fill in even with appropriate deference).

## C.  Sixth Amendment Violation

Finally, Booker alleges that the district court's invocation of the mandatory minimum sentence that would accompany a conviction on the gun charge during sentencing amounts to a violation of his Sixth Amendment right to a jury trial. That is, appellant claims that the reference was not a permissible discussion of acquitted but relevant conduct, *see United States v. Watts*, 519 U.S. 148, 154 (1997); *United States v. Hurn*, 496 F.3d 784, 788 (7th Cir. 2007), but rather "was an enhancement for conduct found by the judge, and based on a mandatory consecutive minimum sentence that was statutorily impermissible."

Supreme Court precedent and our own decisions foreclose this argument. While *Watts* endorsed consideration of acts not proven beyond a reasonable doubt at sentencing, 519 U.S. at 156, the Sixth Amendment does

impose some limits on the discretion of the district court. Namely, "the Federal Constitution's jury-trial guarantee proscribes a sentencing scheme that allows a judge to impose a sentence above the statutory maximum based on a fact, other than a prior conviction, not found by the jury or admitted by the defendant." *Cunningham v. California*, 549 U.S. 270, 274 (2007). No such transgression occurred here. Under 21 U.S.C. §§ 841 and 851, the district court had the power to sentence Booker to a substantively reasonable term of imprisonment ranging from 20 years to life, as long as it followed the procedure set out in *Gall.* It did so, and the Sixth Amendment did not prohibit the court from accounting for the fact that Booker was not only a drug dealer, but also a convicted felon who carried a weapon. *See United States v. Booker*, 543 U.S. 220, 233 (2005) ("We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range."); *Blakely v. Washington*, 542 U.S. 296, 303-04 (2004) ("[T]he relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings."); *United States v. Ashqar*, 582 F.3d 819, 824-25 (7th Cir. 2009). Accordingly, Booker's sentence comports with the Constitution's jury-trial guarantee.

### III. Conclusion

For the foregoing reasons, we AFFIRM the district court's judgment.

---