PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

LAURA SENNETT,

        *Plaintiff-Appellant,*

        v.

UNITED STATES OF AMERICA,

        *Defendant-Appellee,*

        and

VINCENT ANTIGNANO, in his individual capacity; ARLINGTON COUNTY; JASON K. BRYK, in his individual capacity; PRINCE WILLIAM COUNTY,

        *Defendants.*

No. 11-1421

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
T. S. Ellis, III, Senior District Judge.
(1:10-cv-01055-TSE-JFA)

Argued: December 7, 2011

Decided: January 30, 2012

Before TRAXLER, Chief Judge, and MOTZ and KEENAN,
Circuit Judges.

Affirmed by published opinion. Chief Judge Traxler wrote the
opinion, in which Judge Motz and Judge Keenan joined.

**COUNSEL**

**ARGUED:** Jeffrey Louis Light, LAW OFFICE OF JEFFREY LIGHT, Washington, D.C., for Appellant. Julie Ann Edelstein, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Neil H. MacBride, United States Attorney, Lauren A. Wetzler, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

---

**OPINION**

TRAXLER, Chief Judge:

Laura Sennett appeals the district court's order granting summary judgment to the United States on her claim seeking money damages for alleged violations of the Privacy Protection Act ("PPA"). *See* 42 U.S.C. § 2000aa. For the reasons that follow, we affirm.

The facts are essentially undisputed. Sennett is a photojournalist who claims a special interest in covering protests, political demonstrations, and "grassroots activism." J.A. 12. Since 2005, Sennett has published her photographs under the pseudonym "Isis" in various publications such as the Toronto Free Press. Sennett has also posted her photography and commentary on her website, her personal blog and the Internet in general.

On April 11, 2008, Sennett received a phone tip that there would be a demonstration during the International Monetary Fund's ("IMF") annual spring meeting at the Four Seasons Hotel in Washington, D.C., where some of the 200 delegates that attended the meeting were housed. Following the tip, Sennett arrived at the Four Seasons at approximately 2:30 a.m. on April 12, 2008, in order to photograph the protest.

According to Sennett, she was unaware that the purported protesters planned to destroy property or commit other criminal acts; she merely intended to photograph the event and publish the resulting photographs.

The incident was captured on tape by hotel surveillance cameras, which showed a group of about sixteen individuals gathered at the main entrance of the hotel. Many in the group were wearing masks, black hooded jackets, and sunglasses, although some made no effort to disguise their identities. A number of the individuals wore backpacks. Several of the individuals entered the hotel lobby and threw firecrackers and smoke-generating pyrotechnic devices, along with paint-filled balloons, at various targets in the lobby. At some point, one of the individuals in the lobby shattered a large glass window by the entrance. After the vandals left the building, all of the individuals, including those who had remained outside of the hotel lobby, fled on foot or by bicycle. The hotel estimated that the "protesters" caused more than $200,000 in property damage.

Officer Vincent Antignano, who was a detective with the Prince William County Police Department and a deputized federal marshal for the FBI Joint Terrorism Task Force, investigated the incident. In reviewing the hotel's security camera footage, Officer Antignano noticed a white female using a small handheld camera to videotape or photograph the protest. The unidentified photographer wore dark clothing, a light colored beret, black combat boots, and she carried a gray and black backpack. She could be seen arriving at the Four Seasons hotel at the same time as the other individuals in the group. Like several others present, the photographer did not enter the lobby and remained outside during the incident in the lobby. And, after the people who damaged the lobby exited the hotel, the unidentified female fled from the hotel with or in the same general direction as the protesters.

Eventually, Officer Antignano identified the female photographer as Sennett. In his affidavit in support of a search

warrant for her residence, Officer Antignano explained that he discovered Sennett's identity based on tips provided by two "reliable sources":

> A reliable source (RS #1) who is not in the position to testify, but has provided reliable information in the past, advised that the unidentified white female has been seen at several protests throughout the Washington DC area. Furthermore, she is frequently seen wearing the light colored beret and black combat boots at demonstrations in the Washington DC area.

> With the help of open source websites ([e.g.] Google, Youtube), a white female matching the same physical description[ ] was observed on videotape demonstrating in front of FBI Headquarters . . . on December 8, 2007. She was also observed demonstrating in front of the Church of Scientology . . . on February 10, 2008. During both events, she was observed wearing the same light colored beret and black combat boots captured on hotel security cameras.

> A second reliable source (RS #2), who is not in the position to testify, but has provided reliable information in the past, advised that the unidentified white female goes by the name of "ISIS". The source was able to provide a cellular telephone number . . . .

> . . . [O]pen source information regarding the cellular telephone number . . . revealed a Laura Sennett . . . living [in] . . . Arlington, Virginia. A photograph obtained from Virginia [DMV] of Sennett matched the . . . female captured on the . . . Hotel security cameras.

J.A. 26-27. Officer Antignano obtained Sennett's address using the foregoing information, and various officers conducted follow-up surveillance of her residence and confirmed that Sennett lived there.

Based on this information, Officer Antignano sought a search warrant, believing it likely that Sennett's residence contained evidence of suspected criminal activity that occurred during the IMF protest at the Four Seasons, including burning or destroying a dwelling, *see* Va. Code 18.2-77; manufacturing, possessing, or using fire bombs or explosives, *see* Va. Code 18.2-85; and injuring property, *see* Va. Code 18.2-137. The magistrate issued the requested warrant. The warrant authorized seizure of items connected with the IMF protest, such as clothing worn by Sennett during the event, along with essentially anything that might store pictures or video:

> Any and all computers and peripheral devices, such as but not limited to: desktop, laptop, mobile and handheld computers, printers, scanners, external drives and tapes, CDs, DVDs, thumb drives, flash cards, and any other digital media capable of storing digital or electronic data. Any and all computer hardware and software that is used with the operation of these computers, to view or create data. . . . Any and all cell phones, personal digital assistants, and other devices in which records and data may be stored. Any and all beret[s], black combat/military style boots, gray/black backpack, including any identifiable clothing related to the offense. Gunpowder, smoke devices, firecrackers, flash powder, hobby cord, and any or all items related to smoke generating pyrotechnic devices, paint, balloons, or similar items that may have been used in the commission of the instant offense.

J.A. 29.

On September 23, 2008, Officer Antignano and numerous other law enforcement officers executed the search warrant. The agents seized dozens of items, including an external hard drive allegedly containing more than 7,000 photographs, two computers, several cameras, and several camera memory cards. According to Sennett's complaint, three officers, including Officer Antignano, told Sennett during the raid that they knew she was a photojournalist. Sennett purportedly admitted during the search that she was present and took photos at the hotel during the protest, and that the photos were located on her computer. Sennett was never arrested or charged with any crimes relating to this incident.

Believing the search of her apartment to be unlawful, Sennett brought this action against the United States under the Privacy Protection Act ("PPA"). *See* 42 U.S.C. §§ 2000aa *et seq*.\* The district court granted summary judgment in favor of the United States. The court concluded that the "suspect exception" to the PPA, *see* 42 U.S.C. § 2000aa(a)(1), barred Sennett's claim because there was probable cause to believe that Sennett was involved in criminal activity at the Four Seasons hotel on April 12, 2008, and the search of her home related to the investigation of that incident. *See Sennett v. United States*, 778 F. Supp. 2d 655, 666 (E.D. Va. 2011).

On appeal, Sennett argues, as she did below, that summary judgment was inappropriate because the facts, if viewed in a light most favorable to her, did not permit a finding of probable cause. We disagree.

Congress passed the PPA in response to *Zurcher v. Stanford Daily*, 436 U.S. 547, 567-68 (1978), in which the Supreme Court held that the Fourth Amendment does not prohibit the search of a newspaper office for photographs revealing the identities of those who assaulted police officers during

---

\*Sennett originally named several other defendants in this action; however, only the United States remains as a defendant.

a demonstration, even though no one employed by the newspaper was suspected of involvement. *See Guest v. Leis*, 255 F.3d 325, 340 (6th Cir. 2001) ("[T]he PPA was enacted to afford the press and certain other persons not suspected of committing a crime with protections not provided currently by the Fourth Amendment." (internal quotation marks omitted)). Accordingly, the PPA prohibits government searches for documents and materials that are *intended for publication*. *See* 42 U.S.C. § 2000aa(a) & (b) (prohibiting the search for and seizure of materials possessed with "a purpose to disseminate to the public"); *Citicasters v. McCaskill*, 89 F.3d 1350, 1353 (8th Cir. 1996) (explaining that the PPA "generally prohibits government officials from searching for and seizing documentary materials possessed by a person in connection with a purpose to disseminate information to the public").

The PPA, however, carves out various exceptions to the prohibition against searches and seizures of materials intended for public dissemination. *See* 42 U.S.C. §§ 2000aa(a)(1) & (2); 2000aa(b)(1)-(4). In this case, the government relies on the so-called "suspect exception," under which "[t]he police can avoid the constraints of the [PPA] . . . when the person possessing the materials is a criminal suspect, rather than an innocent third party." *Guest*, 255 F.3d at 341. In order for the government to take advantage of this exception, however, there must be "probable cause to believe that the person possessing such materials has committed or is committing the criminal offense to which the materials relate." 42 U.S.C. §§ 2000aa(a)(1) & (b)(1).

Probable cause exists if the "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person . . . in the circumstances shown, [to conclude] that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). "Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Adams v. Williams*, 407 U.S. 143,

149 (1972). Indeed, it is irrelevant to the probable cause analysis what crime a suspect is eventually charged with, *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004), ("The rule that the offense establishing probable cause must be 'closely related' to, and based on the same conduct as, the offense identified by the arresting officer at the time of arrest is inconsistent with [ ] precedent."), or whether a person is later acquitted of the crime for which she or he was arrested, *see DeFillippo*, 443 U.S. at 36.

The district court concluded that the government was entitled to summary judgment under the suspect exception based on the totality of the undisputed facts derived from the hotel security camera footage. First, "Sennett arrived . . . within seconds of the vandals," suggesting "that Sennett communicated in some fashion with the vandals prior to the incident." *Sennett*, 778 F. Supp. 2d at 663. Second, "Sennett arrived at the hotel in the middle of the night—at 2:30 a.m.," suggesting the intent "to avoid observation by the public or the authorities" of unlawful acts rather than "to advance a viewpoint by displaying . . . that viewpoint to others." *Id.* The district court noted that Sennett "did not display any press credentials, nor did she carry any photographic equipment other than the small, handheld camera." *Id.* at 664. Third, "similar to the vandals, Sennett was wearing dark clothing and a backpack." *Id.* at 663. Fourth, "[a]fter the acts of vandalism were committed, Sennett fled from the area in the same direction as the vandals," even though she had remained outside of the hotel and never entered the lobby. *Id.* at 664. Fifth, Officer Antignano discovered video footage of Sennett engaging in other demonstrations in Washington, D.C. Taking the facts as a whole, the district court concluded there was probable cause to believe Sennett conspired with the group of vandals or aided and abetted the offenses committed by the group:

> While the security camera footage does not show
> Sennett entering the hotel or participating in the acts
> of vandalism caught on tape, there was probable

cause to believe that she had committed a criminal offense *relating to* the April 12 Four Seasons incident, such as engaging in a conspiracy to commit vandalism or aiding and abetting acts of vandalism. Indeed, a reasonable person would be warranted in believing that Sennett's role in the vandalism was to serve as the group's photographer or videographer, so that a memorialization of the event could be used to advance the group's purposes and to claim responsibility. Furthermore, the property seized at Sennett's residence during the September 23, 2008 search was related to the April 12 Four Seasons incident.

*Id.*

Sennett argues that none of these facts requires a finding of probable cause and that there is an innocent explanation for her actions. For instance, Sennett argues that she believed there was a noncriminal purpose for protesting at night—such as waking up the IMF delegates—rather than concealing criminal acts under cover of darkness. Moreover, Sennett argues that she fled not out of a consciousness of guilt, but because she was frightened for her safety. Such plausible explanations, based on Sennett's subjective mindset, however, do not factor into the probable cause calculus. "[I]n considering the totality of the circumstances, [a defendant's] innocent explanations for his odd behavior cannot eliminate the suspicious facts from the probable cause calculus. The test is not whether the conduct under question is consistent with innocent behavior; law enforcement officers do not have to rule out the possibility of innocent behavior." *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1024 (9th Cir. 2009) (internal quotation marks omitted). Furthermore, the fact that any one fact—such as Sennett's wearing dark clothing or her close temporal and physical proximity to the commission of the crimes—would not alone support a finding of probable cause does not mean that probable cause was absent, since "[a]n assessment of the presence of probable cause must be based

on the totality of the relevant circumstances." *United States v. Allen*, 631 F.3d 164, 172 (4th Cir. 2011).

Sennett also contends that Officer Antignano knew Sennett was a photojournalist and failed to reveal this fact in his affidavit offered in support of the search warrant application. This fact, even if taken as true, cannot destroy probable cause without more. As the district court observed, "to accept Sennett's argument that her status as a photojournalist is a game changer in the probable cause analysis . . . is tantamount to doing what Congress declined to do, namely exclude journalists from the PPA's 'suspect exception.'" *Sennett*, 778 F. Supp. 2d at 666. Although Sennett's occupation provides an innocent explanation for her appearance in the security camera footage, the other facts nevertheless permitted Officer Antignano to reasonably conclude that Sennett was involved in the acts of vandalism. *See United States v. Booker*, 612 F.3d 596, 601 (7th Cir. 2010) ("The possibility of an innocent explanation does not vitiate properly established probable cause.").

Sennett also points to an FBI memorandum written two years after the crime as definitive proof that there was no probable cause. The document states that an Assistant United States Attorney "reviewed the circumstances of the case and indicated that the [United States Attorney's Office] would not be pursuing charges against . . . Sennett as there was no evidence to date to suggest that Sennett participated in the vandalism." J.A. 35. The existence of probable cause, however, is assessed based on the circumstances known to the officers at the time of the search or arrest; the fact that a suspect is never charged with an offense does not conclusively establish that officers did not have probable cause to arrest for the offense. *Cf. DeFillippo*, 443 U.S. at 36 ("The validity of the arrest does not depend on whether the suspect actually committed a crime; the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest.").

Finally, we reject Sennett's argument that the question of whether the "suspect exception" bars her PPA claim is one that cannot be resolved at the summary judgment stage. When "there is no genuine issue of material fact, the existence of probable cause becomes *a purely legal question* subject to de novo review." *S.P. v. City of Takoma Park, Md.*, 134 F.3d 260, 272 (4th Cir. 1998) (emphasis added). Given that virtually all of the relevant facts are derived from videotape that is in the record, there are no factual issues to be decided. Sennett offers a plausible, innocent explanation for her appearance on the videotape—that she was present to document what she believed would be a lawful demonstration—and suggests that her explanation is a reasonable inference a trier of fact could draw. Her view might well be accepted by a trier of fact; but as pointed out earlier, this does not negate probable cause. Accordingly, we conclude that the United States is entitled to summary judgment based on the "suspect exception" to the PPA.

*AFFIRMED*