**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-4480**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

WILLIAM CRITTENDEN,

Defendant - Appellant.

Appeal from the United States District Court for the District of Maryland, at Baltimore. Catherine C. Blake, District Judge.  (1:14-cr-00412-CCB-4)

Argued:  October 24, 2017                    Decided:  December 6, 2017

Before GREGORY, Chief Judge, and FLOYD and HARRIS, Circuit Judges.

Affirmed by unpublished opinion.  Judge Harris wrote the opinion, in which Chief Judge Gregory and Judge Floyd concurred.

**ARGUED:** Megan Suzanne Skelton, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greenbelt, Maryland, for Appellant.  Jason Daniel Medinger, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** James Wyda, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Baltimore, Maryland, for Appellant.  Rod J. Rosenstein, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PAMELA HARRIS, Circuit Judge:

William Crittenden was a doctor at Healthy Life Medical Group near Baltimore, Maryland, a purported pain management clinic. In actuality, Healthy Life was a pill mill, where doctors, in exchange for cash, prescribed large dosages of controlled substances like oxycodone to patients with no legitimate medical need. After an investigation lasting for over a year, the government sought and received a search warrant for Healthy Life's offices and its patient medical records. The warrant was executed, Crittenden was charged with conspiracy and unlawful distribution of controlled substances, and a jury ultimately convicted Crittenden on several counts.

Before his trial, Crittenden moved to suppress the evidence obtained during the search of Healthy Life, challenging the veracity of the affidavit filed in support of the government's search warrant application. The district court denied Crittenden's motion, holding that Crittenden could not make the preliminary showing required under *Franks v. Delaware*, 438 U.S. 154 (1978), for an evidentiary hearing into the truthfulness of the warrant affidavit. We agree, and affirm the judgment of the district court.

**I.**

Healthy Life operated as a pill mill from March 2011 to May 2012. Crittenden was an early hire, coming to Healthy Life as its medical director in April 2011. And by around the same time, Healthy Life already had come to the attention of the federal Drug Enforcement Administration ("DEA") and the Baltimore County Police Department: A confidential source approached the DEA to identify Healthy Life as a pill mill, and a

3

local pharmacist reached out to the Baltimore County police about suspicious oxycodone prescriptions issuing from Healthy Life.

Crittenden resigned from his job at Healthy Life a few months later, in August 2011, but the law enforcement investigation of Healthy Life continued. In May 2012, the investigating officers applied for a search warrant, swearing out the facts supporting their request in a 20-page affidavit accompanying the warrant application. Among other things, the officers sought to search the medical records of Healthy Life's patients, some of whom had been prescribed oxycodone (an opioid) and alprazolam (generic Xanax) by Crittenden.

The affidavit included a wealth of information, gathered from several sources by the DEA and county police over the preceding 14 months. First, the affidavit provided information about the "pill-mill" operations of Healthy Life derived from the accounts of various confidential sources: out-of-state individuals who had traveled to Healthy Life to pay for prescriptions, former and prospective Healthy Life employees, and an employee of an affiliated MRI business. Second, the affidavit detailed the results of an undercover operation in which four law enforcement officers posed as "patients" and obtained medically unnecessary oxycodone prescriptions from Healthy Life. Third, the affidavit included reports of suspicious Healthy Life prescriptions lodged with law enforcement by several area pharmacies. And finally, there were descriptions of the investigators' surveillance of Healthy Life, which confirmed that large numbers of patients – up to 100 or more each day – were being serviced by Healthy Life. Certain basic facts arose repeatedly, and from multiple sources: Healthy Life was unusually busy; it required up-

4

front cash payments and did not accept insurance; it had many young, out-of-state patients with no visible pain or injury; and its doctors prescribed large quantities of oxycodone and alprazolam to their patients.

A magistrate judge authorized the search warrant, and a search of Healthy Life was conducted later on the same day. The United States ultimately indicted Crittenden along with Healthy Life's three owners and another doctor, charging Crittenden with one count of conspiracy to distribute and 23 counts of unlawful distribution of controlled substances under 21 U.S.C. §§ 841 and 846.

Before trial, Crittenden moved to suppress the patient medical records seized during the search, claiming that the affidavit submitted with the warrant application was defective. According to Crittenden, the affidavit included false statements in its description of the undercover investigation, inconsistent with videotaped records of the agents' interactions with Healthy Life employees. Furthermore, Crittenden claimed, the affidavit omitted information that called into question the credibility of a key confidential source. Because the affidavit contained knowingly or recklessly false statements and misleading omissions material to the probable cause determination, Crittenden concluded, he was entitled to a *Franks* hearing into the veracity of the affidavit. *See Franks v. Delaware*, 438 U.S. 154, 155–56, 171–72 (1978) (defendant challenging affidavit must show that it contains a "deliberate falsehood" or a statement made "with reckless disregard for the truth" that is "necessary to the finding of probable cause").

The government contested Crittenden's entitlement to a *Franks* hearing on two grounds. First, the government argued, any misstatements or misleading omissions in its

5

affidavit were the result of mere negligence, rather than the deliberate or reckless conduct covered by *Franks*. And second, none of the misstatements or omissions identified by Crittenden were material, or "necessary to the finding of probable cause," *id.* at 156, as required by *Franks*; even if corrected to account for Crittenden's alleged errors, the affidavit would continue to support a probable cause determination. In the alternative, the government also maintained that Crittenden lacked Fourth Amendment "standing" to challenge the search, because he did not have a personal interest protected by the Fourth Amendment in Healthy Life's premises or its patient medical records.

After holding a hearing on Crittenden's motion, the district court issued an oral decision denying the request for a *Franks* hearing and the motion to suppress. Whether Crittenden had the personal privacy interest in the searched premises and files that would give rise to Fourth Amendment standing, the district court said, was a "very close question." J.A. 458. But assuming without deciding that Crittenden could challenge the search, the district court held that his *Franks* claim failed on the merits.

The district court agreed with Crittenden that the affidavit's description of the undercover investigation included "troubling misstatements. . . . No question about that." J.A. 460. The affidavit, for instance, suggested that all four of the undercover agents had been prescribed narcotics, "when in fact it was only two." *Id.* And the affidavit was "wrong" when it detailed one undercover visit as involving no physical exam and a doctor "coaching" the agent to identify a high pain level. *Id.* As to the alleged omissions regarding a confidential source – that the source was the subject of a government-fraud investigation, and himself involved in the pill-mill scheme as the doctor who allegedly

6

provided false MRI reports to the clinic – the district court determined that the information "ideally" should have been included, but did not "so significantly" undermine the source's credibility as to preclude reliance on his statements.  J.A. 461.

Ultimately, the district court ruled against Crittenden under the "second prong" of the *Franks* analysis, J.A. 463, holding that the misstatements and omissions identified by Crittenden were not necessary to the magistrate judge's finding of probable cause.  *See Franks*, 438 U.S. at 156.  In conducting this "materiality" analysis, the district court appears to have given Crittenden the benefit of every doubt, taking into account none of the allegations in the affidavit related to the undercover investigation and none of the statements made by the confidential source in question.  Even so, the district court found, there remained ample evidence establishing probable cause:  the reports of other confidential sources, including multiple Healthy Life patients; the pharmacy reports of suspicious prescriptions; and the surveillance confirming unusually high patient volume at the clinic.  Because the contested parts of the affidavit were not essential to the "overall probable cause" finding, the district court denied Crittenden's request for a *Franks* hearing and his motion to suppress.  J.A. 463.

A jury convicted Crittenden of one count of conspiracy and eight substantive counts of unlawful distribution of controlled substances, and Crittenden was sentenced to 36 months in prison.  This timely appeal followed.

7

## II.

Crittenden's only claim on appeal is that the district court erred in denying him a hearing under *Franks* to challenge the veracity of the search warrant affidavit. We review legal conclusions related to the denial of a *Franks* hearing de novo, including the determination of probable cause. *United States v. Allen*, 631 F.3d 164, 171 (4th Cir. 2011). The district court's factual findings are reviewed for clear error. *Id.*

Before we reach the merits of Crittenden's *Franks* claim, we address the issue of Fourth Amendment standing. Though it shares a name with the more familiar Article III concept, Fourth Amendment "standing" is not a matter of jurisdiction. *See Rakas v. Illinois*, 439 U.S. 128, 139–40 (1978). Instead, it refers to the substantive rule that Fourth Amendment rights are personal, and that Fourth Amendment protections are triggered only when an individual has suffered an invasion of his or her own privacy interests. *Id.* at 133–37; *see Doe v. Broderick*, 225 F.3d 440, 450 (4th Cir. 2000) (holding that patient has requisite individual expectation of privacy in medical records). And in this case, according to the government, Crittenden lacks the personal privacy interest in Healthy Life's patient records that would give rise to a Fourth Amendment claim, in part because he was no longer working at the clinic at the time of the search. Crittenden, of course, disagrees, arguing that he retains an expectation of privacy in his patient records, as evidenced by his continuing duty of confidentiality to his patients. Like the district court, we find it unnecessary to resolve this matter. Because it is clear that Crittenden cannot prevail on his *Franks* claim in any event, we may leave for another day the question of a doctor's privacy interest in his or her patients' medical records.

8

The parties agree on the legal framework that governs Crittenden's *Franks* claim. Under *Franks v. Delaware*, Crittenden is entitled to a hearing into the truthfulness of the warrant affidavit only if, first, he can make a "substantial preliminary showing" that false statements were included in the affidavit either deliberately or with reckless disregard for the truth. 438 U.S. at 155–56; *see United States v. Tate*, 524 F.3d 449, 454 (4th Cir. 2008). Because warrant affidavits enjoy a "presumption of validity," allegations of "negligence or innocent mistake are insufficient." *Franks*, 438 U.S. at 171; *Tate*, 524 F.3d at 454. And while alleged omissions do not fall outside the scope of *Franks*, they put a defendant to a higher burden still, requiring a substantial showing that facts were omitted in order to mislead or with reckless disregard for an omission's misleading nature. *Tate*, 524 F.3d at 454–55.

Even if a defendant can make this difficult showing, a *Franks* hearing still is not required if an affidavit's alleged false statements or misleading omissions are not necessary to a finding of probable cause. *Franks*, 438 U.S. at 155–56. In other words, if there is enough to establish probable cause even after allegedly false statements are excised and omitted information included, then the warrant remains valid and the defendant is not entitled to a *Franks* hearing. *Id.*; *see Tate*, 524 F.3d at 455; *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990) ("For an omission to serve as the basis for a hearing under *Franks*, it must be such that its inclusion in the affidavit would defeat probable cause[.]"). Like the district court, we think this second prong of the *Franks* analysis, often referred to as the "materiality" prong, is dispositive here.

But before we turn to materiality, we note that we have no reason to question the district court's judgment that "troubling misstatements," J.A. 460, were included in this affidavit. In connection with the undercover operation at Healthy Life, the affidavit averred generally that "[t]he undercover agents were provided with large quantities of narcotics," J.A. 287, although, as the district court observed, only two of the four agents actually left Healthy Life with prescriptions. J.A. 460. Moreover, the description of one of those agent's interactions with Crittenden included at least two statements that were simply "wrong," as the district court noted, *id.*: Though the affidavit detailed Crittenden coaching the agent to identify a pain level of "4 or 6," J.A. 288 ("The [agent] stated that [his pain level] was a '2.' The doctor responded, 'It must be more like 4 or 6, right?'"), that conversation did not happen; and though the affidavit claimed that Crittenden issued a prescription without conducting a physical exam, *id.*, an examination was in fact performed. The reason we can be confident as to the falsity of these statements is that the undercover agents videotaped their interactions at Healthy Life and, as the government concedes, both statements are contradicted by the videotaped record. As the government admitted to the district court, there is no reason why the officers who prepared the affidavit should not have reviewed that videotape before swearing out a minutely detailed and significantly inconsistent account.[1]

---

[1] Crittenden alleges that an additional mischaracterization appears in the affidavit's description of an account given by confidential source number seven, which does not precisely track the wording that appears in a prior investigatory report. The district court acknowledged the difference but found that the affidavit reasonably captured the substance of the report, and we agree.

We also agree with the district court that it "would have been better" had the affidavit included the omitted information bearing on the credibility of one of the government's confidential sources. J.A. 461. That source, an employee of an MRI business affiliated with Healthy Life, was important to the government's case, providing a detailed account of operations behind the scenes at Healthy Life. And his importance was magnified by the fact that he actually was listed *twice* on the government's list of confidential sources, appearing both as "CS1" and "CS8" as a result of what the government describes as a clerical "mix-up." Whether this key source was deemed credible by the magistrate judge might have been colored, at least in part, by information omitted from the affidavit: that the source had been the subject of a government-fraud investigation and was, under the government's theory of the case, conspiring with Healthy Life by providing false MRI reports to justify prescriptions.

Like the district court, however, we need not decide whether these statements and omissions rise to the level of deliberate or reckless falsity or reflect an intent to mislead that would satisfy Crittenden's burden under the first prong of *Franks*. *See* J.A. 460 (describing the false statements as reflecting "at least negligence"); *id.* at 461 (describing the omitted information as not "so significantly undercutting" credibility as to require complete exclusion of the confidential source's statements). Because Crittenden cannot show that the information in question was material to the probable cause determination, he cannot satisfy his burden under the second prong of *Franks*, and that is sufficient grounds for denial of his motion.

11

Under the materiality prong of *Franks*, Crittenden must show that without the false statements and misleading omissions he has identified, the "affidavit cannot support a probable cause finding." *Allen*, 631 F.3d at 171–72 (holding that defendant is not entitled to *Franks* hearing under materiality prong). Notably, in conducting that inquiry, the district court resolved every question in Crittenden's favor, and then some: It did not consider *any* of the information in the affidavit relating to the undercover investigation, rather than excluding only those statements it found to be false;[2] and it did not consider *any* of the information provided by the confidential source at issue, despite its determination that the omitted material did not so undermine his credibility as to require exclusion. *Cf. United States v. Lull*, 824 F.3d 109, 118 (4th Cir. 2016) (where omissions entirely prevent assessment of a source's veracity, statement should be excluded from consideration in probable cause analysis). Yet there remained, the district court held, a sufficient basis for finding probable cause.

We agree. First, the source in question was not the government's only confidential source. As the district court explained, there also was confidential source number seven, a former Healthy Life employee, who observed doctors, in exchange for cash payments, writing narcotics prescriptions for out-of-state patients who appeared to be without injury. Confidential source number six was a doctor who interviewed at

---

[2] Crittenden points to certain other aspects of the description of the undercover operation in the affidavit as "less dramatically false" but nevertheless misleading. Because the district court did not include any information regarding the undercover investigation in its assessment of probable cause, we need not address those claims.

12

Healthy Life but declined to take a job because he was convinced that the clinic was a pill mill. And the doctor shared with investigators the basis for his judgment: crowds of 75 to 80 people waiting to be seen by a doctor; the absence of medical equipment one would expect at a legitimate clinic; and the requirement that patients use a particular MRI business and pay cash in the hundreds of dollars per visit. Finally, there were the former patients of Healthy Life, now additional confidential sources, all of whom reported the same basic story: They traveled to Healthy Life from out of state, paid cash for large – up to 210-count – prescriptions for oxycodone without a legitimate medical need, and were arrested when they tried to fill the prescriptions.

And there is more, as the district court observed. In the months before seeking a search warrant, local police received multiple calls from area pharmacies, alerting them to suspicious Healthy Life prescriptions for out-of-state patients – suspicious not only because of their size (up to 168-count prescriptions for oxycodone) but also because of their uniformity, suggestive of something other than individualized patient assessments. And from January to May 2012, law enforcement's video surveillance of Healthy Life confirmed an unusually high volume of patients, estimated at 120 people per day.

A finding of probable cause is a "practical, commonsense decision," requiring in this context only a "fair probability" that contraband or evidence of a crime will be found in the area to be searched. *Allen*, 631 F.3d at 172 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). And as the district court understood, "that any one fact" – the various confidential sources, the pharmacist reports, the surveillance video – "would not alone support a finding of probable cause does not mean probable cause was absent," *Sennett v.*

13

*United States*, 667 F.3d 531, 536–37 (4th Cir. 2012); probable cause turns not on each fact in isolation but on "the totality of the relevant circumstances," *Allen*, 631 F.3d at 172. J.A. 463 (evaluating the "overall . . . pattern" of probable cause from April 2011 to May 2012). So viewed, the information that remained in the affidavit even after the district court's generous *Franks* excisions was sufficient to establish probable cause, and for that reason, Crittenden cannot make the showing required to justify a hearing under *Franks*.

## III.

For the foregoing reasons, we affirm the judgment of the district court.

*AFFIRMED*