NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS.  A-1838-11T3
                     A-3182-11T3

JOSEPH OETTINGER, III,

     Plaintiff-Appellant,

v.

TOWNSHIP OF BEDMINSTER,
NANCI ARRAIAL, COUNTY OF
SOMERSET, BOROUGH OF
WESTWOOD, and ROBERT SAUL,

     Defendants-Respondents.

_____

JOSEPH OETTINGER, III,

     Plaintiff-Respondent,

v.

TOWNSHIP OF BEDMINSTER
and NANCI ARRAIAL,

     Defendants-Appellants,

and

COUNTY OF SOMERSET, BOROUGH
OF WESTWOOD, and ROBERT SAUL,

     Defendants.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| October 31, 2013 |
| APPELLATE DIVISION |

Argued April 8, 2013 — Decided October 31, 2013

Before Judges Ashrafi, Espinosa and Guadagno.

On appeal from Superior Court of New Jersey, Chancery Division, General Equity Part, Bergen County, Docket No. C-35-10.

Joseph Oettinger, Jr., argued the cause for appellant in A-1838-11 and respondent in A-3182-11.

Richard J. Guss argued the cause for Township of Bedminster and Nancy Arraial, respondents in A-1838-11 and appellants in A-3182-11 (DiFrancesco, Bateman, Coley, Yospin, Kunzman, Davis, Lehrer & Flaum, P.C., attorneys; Mr. Guss, on the briefs).

Scott D. Rodgers, Deputy County Counsel, argued the cause for respondent County of Somerset in A-1838-11 (William T. Cooper, III, Somerset County Counsel, attorney; Mr. Rodgers, on the brief).

Mary C. McDonnell argued the cause for respondents Robert Saul & Borough of Westwood in A-1838-11 (Pfund McDonnell, P.C., attorneys; Ms. McDonnell and David T. Pfund, on the brief).

The opinion of the court was delivered by

ESPINOSA, J.A.D.

Although it was enacted in 1979, there are no published opinions that interpret or apply the Subpoena First Act, N.J.S.A. 2A:84A-21.9 to -21.13 (the Act),[1] which has been described as "narrowly circumscrib[ing] the situations in which the State can properly search and seize materials acquired in the course of newsgathering." In re Woodhaven Lumber and Mill

---

[1] L. 1979, c. 488, § 1 (effective Feb. 28, 1980).

Work, 123 N.J. 481, 491 (1991) (analyzing the Shield Law, N.J.S.A. 2A:84A-21 to -21.8); see also In re Subpoena Issued to Schuman, 114 N.J. 14, 24 (1989) (same). In this case, we consider the application of the Act to a suspect in a criminal investigation who asserted a claim to its protection based upon his status as an "internet publisher" after a search warrant was executed and his suppression motion was denied. We affirm the dismissal of plaintiff's complaint against all defendants. As for his claims under the Act, we hold that plaintiff waived any claim to protection; that the officers here were not required to conduct an investigation to determine whether plaintiff was protected by the Act prior to seeking a warrant; and that, even if plaintiff had timely asserted his claim, he was not entitled to the Act's protection because the materials sought were not obtained in the course of newsgathering activities.

Defendants Township of Bedminster and Nanci Arraial (the Bedminster defendants) appeal from the denial of their motion for counsel fees pursuant to Rule 1:4-8. For the reasons that follow, we affirm that denial as well.

I.

It is generally acknowledged that the Act, like its federal counterpart, the Privacy Protection Act (PPA), 42 U.S.C.A. §§ 2000aa-aa12, was a legislative response to the United States

Supreme Court's decision in Zurcher v. Stanford Daily, 436 U.S. 547, 567-68, 98 S. Ct. 1970, 1982-83, 56 L. Ed. 2d 525, 543 (1978). See Sennett v. United States, 667 F.3d 531, 535 (4th Cir. 2012); Guest v. Leis, 255 F.3d 325, 340 (6th Cir. 2001); Byrnes, Current New Jersey Arrest, Search & Seizure 573-74 (2012-13); Debra L. Stone, The Criminal Justice System and the News Media: Recent Developments, 7 Crim. Just. Q. 178, 196 (1980).

Zurcher had its roots in an April 1971 demonstration at Stanford University Hospital that devolved into a violent clash in which a group of demonstrators, armed with sticks and clubs, attacked and injured nine police officers. Zurcher, supra, 436 U.S. at 550, 98 S. Ct. at 1973-74, 56 L. Ed. 2d at 532. Articles and photographs published in the Stanford Daily, a student newspaper, suggested that a Daily staff member might have photographed the assault on the officers. Although there was no allegation that any members of the Daily staff had engaged in unlawful activity, the Santa Clara County District Attorney's Office obtained a warrant to search the Daily's office for negatives and photographs that would assist in the identification of the persons who assaulted the officers. Id. at 551, 98 S. Ct. at 1974, 56 L. Ed. 2d at 532. When the warrant was executed, the only photographs found were those that had already been published. No materials were removed from the

Daily's office. <u>Id.</u> at 551-52, 98 <u>S. Ct.</u> at 1974, 56 <u>L. Ed.</u> 2d at 533.

The student newspaper and various staff members brought a civil action, seeking declaratory and injunctive relief under 42 <u>U.S.C.A.</u> § 1983, against the law enforcement officials involved and the judge who issued the warrant. Judgment was entered in favor of the newspaper and its staff members and affirmed by the Court of Appeals. However, the Supreme Court reversed, stating,

> [W]e decline to reinterpret the [Fourth] Amendment to impose a general constitutional barrier against warrants to search newspaper premises, to require resort to subpoenas as a general rule, or to demand prior notice and hearing in connection with the issuance of search warrants.
>
> [<u>Id.</u> at 567, 98 <u>S. Ct.</u> at 1982, 56 <u>L. Ed.</u> 2d at 543.]

The Court added, "Of course, the Fourth Amendment does not prevent or advise against legislative or executive efforts to establish nonconstitutional protections against possible abuses of the search warrant procedure[.]" <u>Ibid.</u> Congress and a number of state legislatures,[2] including New Jersey, accepted the invitation to establish such protections.

---

[2]  <u>Or. Rev. Stat.</u> § 44.520(2) (2011); <u>Wash. Rev. Code</u> § 10.79.015(3) (2013); <u>Wis. Stat.</u> § 968.13(1)(d) (2013); <u>Conn. Gen. Stat.</u> § 54-33j(a) (2013); <u>Tex. Code Crim. Proc.</u> art. 18.01(e) (West 2001); 725 <u>Ill. Comp. Stat.</u> 5/108-3(b) (2013).

The protection provided by the federal statute does not turn on whether the person who possesses the materials sought is a member of the news media. Rather, the prohibition applies when the person in possession has "a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication." 42 U.S.C.A. § 2000aa(a), (b). The PPA has certain limited exceptions, which include a "suspect" exception:

> [T]his provision shall not impair or affect the ability of any government officer or employee, pursuant to otherwise applicable law, to search for or seize such materials, if--
>
> (1) there is probable cause to believe that the person possessing such materials has committed or is committing the criminal offense to which the materials relate . . . .
>
> [Ibid.]

The prohibition in New Jersey's Act provides in pertinent part:

> Any person . . . engaged on, engaged in, connected with, or otherwise employed in gathering, procuring, transmitting, compiling, editing, publishing, or disseminating news for the public . . . shall be free from searches and seizures, by . . . law enforcement officers with respect to any documentary materials obtained in the course of pursuing the aforesaid activities whether or not such material has been or will be disseminated or published.

6

[N.J.S.A. 2A:84A-21.9.]

Like the PPA, the Act has exceptions to the general prohibition, which include a "suspect" exception virtually identical to that in the federal statute:

> This section shall not restrict or impair the ability of any law enforcement officer, pursuant to otherwise applicable law, to search for or seize such materials, if there is probable cause to believe that:
>
> a. The person, corporation, partnership, proprietorship or other entity possessing the materials has committed or is committing the criminal offense for which the materials are sought . . . .

[Ibid.]

That the statute was a legislative response to Zurcher is reflected in the distinction between the Act's application to materials possessed by persons who are not suspects in a criminal investigation and its explicit exception for situations where the person in possession is suspected of "committing the criminal offense for which the materials are sought." The salient facts in Zurcher that caught the public's attention were related to the unequivocal status of the persons in possession as journalists doing their job. No Daily staff member was suspected of criminal activity, and the items sought — the photographs and negatives — were unquestionably obtained in the course of newsgathering activity. As the Assembly Judiciary,

Law, Public Safety and Defense Committee Statement on this legislation explained:

> The purpose of this bill is to preserve the first amendment's freedom of the press by insuring that <u>the files of the news media shall not be the subject of searches and seizures</u> by law enforcement officials, <u>except</u> . . . in specifically enumerated special cases. The exceptions [include] <u>where there is probable cause to believe that: the news media is involved in a crime</u> . . . .
>
> [<u>Assembly Judiciary, Law, Public Safety and Defense Committee, Statement to A.1535</u> (June 28, 1979) (emphasis added).]

This distinction is further evident in the nature of the remedy provided. If a search or seizure is conducted in violation of the Act, the aggrieved party may bring a civil action. <u>N.J.S.A.</u> 2A:84A-21.11. However, the Act does not provide for the suppression of evidence seized in violation of the statute.

## II.

We now turn to the facts of this case, which are derived from the record and the trial court's decision.

Detective Nanci Arraial of the Bedminster Township Police Department initiated an investigation in 2007 after Amy Wollock, an associate dean at Rutgers University, contacted her concerning a website, amywollock.com. Wollock told Arraial she advised plaintiff, a master's degree student, that he needed

A-1838-11T3

some additional humanities classes before she would approve his certification to become a teacher in New Jersey. Plaintiff threatened to sue Rutgers if he was not approved for a teacher certification. Wollock told Arraial she was afraid of plaintiff.

Amywollock.com was a self-described "web gripe site." The text on the website began,

> I have a gripe with Amy Wollock (former Director of Teacher Education) of the Rutgers University Graduate School of Education (GSE), New Brunswick, NJ. Unfortunately, I was systematically threatened and excluded from opportunities to file a formal grievance against Amy Wollock while I was a student at Rutgers, so this web site had become my only recourse.

The website had a photograph of Wollock, with a countdown feature immediately below that stated, "Only 208 days until the fun begins." The number of days was reduced on a daily basis. The website did not explain what was meant by "the fun." Plaintiff invited readers to return to the site to "tell your own horror story" and promised not to publish names or contact information unless requested to do so.

Through the use of grand jury subpoenas, Arraial learned that amywollock.com was created using an email account, amywollock@gmail.com, and that the registrant for that account was listed as Amy Wollock. Arraial confirmed that Wollock had

9

not created the email account and, investigating further, was able to ascertain, through the IP address, that the creator of the website was Joseph Oettinger.

Arraial filed a complaint against plaintiff alleging that amywollock.com constituted harassment in violation of N.J.S.A. 2C:33-4(a). Plaintiff was found guilty in Bedminster Municipal Court and sentenced to probation in February 2009, with the conditions that plaintiff have no contact with Wollock and was prohibited from "using [his] computer to make inquiries of any kind about" her. Plaintiff appealed and was found not guilty by the Superior Court on July 23, 2009.

However, on June 10, 2009, before plaintiff's conviction was reversed, Wollock contacted Arraial regarding amywollock.wordpress.com, a website she believed violated the municipal court's order. The wording on the website mirrored the nature and content of amywollock.com. In addition, the website included hyperlinks to: a mapping system that showed Wollock's home address with an aerial map of her home; Wollock's email address, phone number, and a background check on her; and other links to websites that offered personal information such as the names of several of Wollock's relatives, her previous addresses, date of birth, average income, and average home value.

10                                                        A-1838-11T3

Through the use of grand jury subpoenas, Arraial obtained subscriber information for the website and learned that amywollock.wordpress.com was registered on June 30, 2007. Arraial also learned the subscriber's username (amywollock), user email (amywollock@gmail.com), and IP address. None of these were created by Wollock. Through the IP address, Arraial determined that the website and email account were created and used on plaintiff's computer.

In November 2009, the Somerset County Prosecutor's Office applied for a search warrant/communications data warrant for plaintiff's residence in Westwood. The stated purpose of the warrant application was to obtain evidence of impersonation/theft of identity, N.J.S.A. 2C:21-17(a)(1); trafficking in personal identifying information pertaining to another person, N.J.S.A. 2C:21-17.3(a); forgery, N.J.S.A. 2C:21-1(a)(2); and uttering, N.J.S.A. 2C:21-1(a)(3).

The warrant was issued by a Superior Court judge and, on November 9, 2009, executed by Arraial, another Bedminster detective, and two Somerset County Prosecutor's Office detectives. Robert Saul, a police detective from the Borough of Westwood who had been involved in prior, unrelated

11                                                           A-1838-11T3

investigations concerning plaintiff,[3] was present as local law enforcement. He did not participate in the search and seizure of plaintiff's property. Approximately eighteen items, including plaintiff's computers and related equipment, cell phone, and digital camera, were seized.

According to plaintiff, when the officers arrived at his home at 9:00 a.m. on November 9, 2009, they announced they were executing a search warrant/communications data warrant. He asked what this was about. One of the officers replied that it was "about a website." Plaintiff replied that he had "a lot of websites" and asked which one they were talking about. Plaintiff stated the officers did not respond but threatened him with arrest for obstruction. He testified he told the officers, "I need to call my attorney. I need to see the search warrant." The officers passed the search warrant through the door, and plaintiff then called his attorney.

---

[3] In March 2005, Saul conducted an investigation after a complainant informed him that his deceased father's name had been used as the registrant of westwoodcops.com. Saul's investigation revealed that plaintiff was the operator of the site, but no charges were filed because the victim suffered no monetary loss.

At no time before, during, or after the execution of the warrant did plaintiff advise the officers that he was entitled to the protection afforded by the Act.[4]  He testified,

> I told them that I had websites.  So they were on notice that I was an internet publisher.  I don't have to be a journalist under the statute.  I could be a publisher of news and information.  Via an electronic medium.

Plaintiff filed a motion to suppress the seized evidence. The motion judge found that the application for the search warrant was supported by sufficient evidence to establish the requisite probable cause and denied the motion on January 19, 2010.  Plaintiff did not appeal the denial of his suppression motion or his subsequent motion for reconsideration.  Plaintiff was never charged with any of the offenses listed in the warrant.

In January 2010, more than two months after the search warrant was executed and approximately one week after his challenge to the search warrant failed, plaintiff filed a verified complaint against the Bedminster defendants, Somerset County, and the Borough of Westwood and Saul (the Westwood defendants), seeking injunctive relief and damages.  It was in

---

[4]  Given the relative obscurity of the Act, it could be that plaintiff was unaware of its existence at the time the warrant was executed.  However, neither he nor Arraial claimed a lack of knowledge of the Act as an explanation for their conduct.

this complaint that plaintiff asserted for the first time that the execution of the search warrant was a violation of the Act because he "is a person engaged in gathering, procuring, transmitting, compiling, editing, publishing, or disseminating news for the public, via the internet."

In June 2010, the Bedminster defendants filed a demand for withdrawal of frivolous pleadings pursuant to Rule 1:4-8. All parties filed motions for summary judgment. The trial court granted summary judgment in favor of Somerset County and the Westwood defendants, dismissing the claims against them. The court denied the summary judgment motions of plaintiff and the Bedminster defendants.

The court conducted a hearing to determine whether plaintiff qualified as a news media person within the meaning of N.J.S.A. 2A:84A-21.9. Following the Supreme Court's decision in Too Much Media, LLC v. Hale, 206 N.J. 209 (2011), the court heard re-argument and issued a written decision finding that plaintiff did not qualify as a newsperson under the Act.

The Bedminster defendants filed a motion for attorney's fees and costs pursuant to Rule 1:4-8, which was denied by the trial court. They appeal from that order.

Plaintiff appeals from the trial court's dismissal of his claims against all defendants. He argues that the trial court

erred in dismissing his claims that defendants Township of Bedminster, County of Somerset, and Borough of Westwood violated the Act because he is a person protected by the Act and therefore enjoys absolute freedom from searches and seizures (Points I and VI). He challenges the trial court's findings that the defendants had a good faith defense under the Act (Point II); that Arraial neither knew nor had a duty to know that he is a newsperson (Point III); and that Somerset County was not a proper party (Point IV). Plaintiff also argues that defendants violated the Act because they failed to obtain the approval of the Attorney General or the Bergen County Prosecutor prior to obtaining the warrant (Point V). Finally, plaintiff argues that the trial court erred in dismissing his allegations that Arraial and Saul violated the New Jersey Civil Rights Act, N.J.S.A. 10:6-2(c) (Point VII).

We hold that plaintiff's claims resting upon the Act were properly dismissed. Because defendant did not appeal from the order denying his motion to suppress evidence, the argument that the warrant was not supported by probable cause advanced in Point VI is not properly before us. We also conclude that plaintiff's claims based upon alleged violations of the Civil Rights Act were properly dismissed. Plaintiff's remaining

arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

The facts concerning plaintiff's activities and the issuance and execution of the search warrant are essentially undisputed. The issue here is the legal significance of those facts. Therefore, our review is de novo. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

### III.

The Act declares that persons engaged in enumerated activities are "free from searches and seizures" of documentary materials obtained during the course of those activities, with certain exceptions. N.J.S.A. 2A:84A-21.9. Significantly, the Act is designed to reach searches and seizures that would be sanctioned if only subject to a Fourth Amendment analysis. Plaintiff's arguments require us to address "who" and "what" the Legislature intended to protect and the obligations of claimant and law enforcement when a suspect in a criminal investigation who claims the Act's protection lacks a connection to traditional news media.

"In reading and interpreting a statute, primary regard must be given to the fundamental purpose for which the legislation was enacted." N.J. Builders, Owners & Managers Ass'n v. Blair, 60 N.J. 330, 338 (1972). "To discern the Legislature's intent,

courts first turn to the plain language of the statute in question."  In re Young, 202 N.J. 50, 63 (2010); DiProspero v. Penn, 183 N.J. 477, 492 (2005); Hubbard v. Reed, 168 N.J. 387, 392 (2001).  "If the plain language leads to a clear and unambiguous result, then [the] interpretive process is over."  Richardson v. Bd. of Trs., Police & Firemen's Ret. Sys., 192 N.J. 189, 195 (2007).  "However, where a literal interpretation would create a manifestly absurd result, contrary to public policy, the spirit of the law should control."  Turner v. First Union Nat'l Bank, 162 N.J. 75, 84 (1999).  "Thus, when a literal interpretation of individual statutory terms or provisions would lead to results inconsistent with the overall purpose of the statute, that interpretation should be rejected."  Hubbard, supra, 168 N.J. at 392-93 (internal quotation marks and citations omitted).

The "who" element of the Act establishes a category of persons who may seek its protection, identifying them by their engagement in enumerated activities, i.e., "gathering, procuring, transmitting, compiling, editing, publishing, or disseminating news for the public."  N.J.S.A. 2A:84A-21.9 (news-persons).  There is also a "what" component that limits its application to documentary materials obtained in the course of pursuing news activities.  "Documentary materials" are defined

as "materials upon which information is recorded and includes, but is not limited to, written or printed materials, photographs, tapes, videotapes, negatives, films, outtakes and interview files." N.J.S.A. 2A:84A-21.12(a). The Act does not require that the material in question "has been or will be disseminated or published." N.J.S.A. 2A:84A-21.9.

Plaintiff has never been employed as a journalist by any conventional news outlet. He argues that he is protected by the Act because he considers himself "a legitimate gatherer and publisher of news and information for the public." It is clear, however, that a person does not become "free from searches and seizures" under the Act solely by virtue of a claimed newsperson status. Cf. Too Much Media, supra, 206 N.J. at 240-42. As the Court recognized in addressing the application of the Shield Law, it requires little analysis to determine whether a person associated with traditional media may claim the privilege under that law. Id. at 241-42. However, when, as here, a "self-appointed" journalist or publisher claims statutory protection, more scrutiny is required. Id. at 242.

Analyses of the Shield Law provide limited guidance. A person who claims the privilege afforded by the Shield Law must show a connection to "news media" as defined in the statute, i.e., "newspapers, magazines, press associations, news agencies,

wire services, radio, television or other similar printed, photographic, mechanical or electronic means of disseminating news to the general public." N.J.S.A. 2A:84A-21a(a).[5] Accordingly, the Court's "focus" in Too Much Media was on the meaning of "news media." 206 N.J. at 231.

A similar nexus to "news media" was included when the Act was first proposed. The Assembly Judiciary, Law, Public Safety and Defense Committee Statement (June 28, 1979) declares the bill, A.1535, was intended "to preserve the first amendment's freedom of the press by insuring that the files of the news media shall not be the subject of searches and seizures by law enforcement officials." (Emphasis added). However, the terms "news" and "news media" were not defined and "news media" was not even mentioned in the final version of the Act.[6]

---

[5] N.J.S.A. 2A:84A-21.3(a) requires claimants to make a prima facie showing that (1) they have the requisite connection with news media, (2) they have the necessary purpose to gather or disseminate news, and (3) the materials subpoenaed were obtained in the ordinary course of pursuing professional newsgathering activities.

[6] "News media" is mentioned in the headnote for the Act. However, because headnotes are not the product of legislative action, N.J.S.A. 1:3-1; State v. Darby, 246 N.J. Super. 432, 440-41 (App. Div.), certif. denied, 126 N.J. 342 (1991), they are not deemed part of the legislation itself and do not assist in statutory interpretation. N.J.S.A. 1:1-6; State v. Malik, 365 N.J. Super. 267, 279 (App. Div. 2003), certif. denied, 180 N.J. 354 (2004).

As introduced, the "who" component of the Act tracked the language of the Shield Law to identify the category of persons covered. But amendments to the bill arguably expanded the category of persons who might claim its protection. For example, the amendments deleted language requiring that a protected person be employed "by news media for the purpose of" news gathering and disseminating activities.[7] The word "professional" was deleted from the description of activities. Publishing was added to the enumerated activities that could provide a basis for protection under the Act.

---

[7] For clarification, we provide the amendments to the relevant paragraph, with deletions struck through and additions underlined:

> Any person, corporation, partnership, proprietorship or other entity engaged on, engaged in, connected with, or otherwise employed ~~by news media for the purpose of~~ in gathering, procuring, transmitting, compiling, editing, publishing, or disseminating news for the ~~general~~ public, or on whose behalf news is so gathered, procured, transmitted, compiled, edited, published or disseminated ~~has a privilege to~~ shall be free from searches and seizures, by State, county and local law enforcement officers~~, for~~ with respect to any documentary materials obtained in the course of pursuing ~~his professional~~ the aforesaid activities whether or not such material has been or will be disseminated or published.

A-1838-11T3

At the time the Act became law, the enumerated activities were performed by readily identifiable, traditional newspersons.[8] Today, the performance of those activities, made far more accessible through the widespread use of electronic media, is a commonplace. See Reno v. ACLU, 521 U.S. 844, 853, 117 S. Ct. 2329, 2335, 138 L. Ed. 2d 874, 886 (1997) ("Any person or organization with a computer connected to the Internet can 'publish' information."); Too Much Media, LLC v. Hale, 413 N.J. Super. 135, 154 (App. Div. 2010), aff'd in part and modified, 206 N.J. 209 (2011); Developments in the Law -- The Law of Media, 120 Harv. L. Rev. 990, 993 (2007). Today, a cellphone can be used by a pedestrian to take a video of an incident of police brutality that will be played on the evening news broadcast. The same phone can be used to record a kitten who refuses to leave a warm bath, producing a video seen by close to four million people on YouTube. In each case, it could be argued that the person who took the video engaged in an activity described in the Act. Nonetheless, we are confident that the Legislature did not intend to provide protection above and

---

[8] Indeed, the statement issued by the Governor's Office after the bill became law states the Act "imposes a strict prohibition against searches and seizures of a newsman's 'work product' materials, except in specific situations." (Feb. 28, 1980) (emphasis added).

beyond that provided by the Fourth Amendment to someone based upon the posting of a video of a wet kitten on the Internet.

The absence of a definition of "news" and the deletion of language requiring a nexus to "news media" and "professional" activities invite an evaluation of the newsworthiness of the material published that is bound to be subjective in nature. In light of the stated purpose to preserve freedom of the press, such a result is undesirable. Cf. Too Much Media, supra, 206 N.J. at 242 ("Hearings [to determine whether the Shield Law privilege applies] should not devolve into extensive questioning about an author's editorial, writing, or thought processes.").

As a self-described "internet publisher," plaintiff's claim to protection under the Act merited more scrutiny than a claim made by a member of traditional news media. See ibid. From the officers' perspective, they went to plaintiff's residence to execute a lawfully issued warrant to search for evidence of offenses committed by plaintiff relating to his two "web gripe sites" regarding Amy Wollock. Asked if she could make an evaluation as to whether plaintiff was "a legitimate gatherer and publisher of news and information for the public" based upon the content of his websites, Arraial testified:

> If there were any indication based on the facts that I had at any point that Mr. Oettinger was a news-reporting individual, I could look at a website and decide that.

22

> But there was absolutely no indication whatsoever that Mr. Oettinger was reporting news during my investigation of amywollock.wordpress.com or any other investigation that I've done on behalf of Ms. Wollock with regard to Mr. Oettinger as a suspect.

Arraial's opinion that the websites failed to establish plaintiff's status as "a news-reporting individual" was not unreasonable. Plaintiff used a subterfuge to distance himself from the Amy Wollock websites, creating an email account in her name and using that to create the websites. Consistent with that conduct, the stated purpose of the warrant application was to obtain evidence that plaintiff used his computer to engage in identity theft and related offenses.

Moreover, plaintiff's own conduct when the warrant was executed failed to alert the officers to any claim of protected status. When the officers announced their purpose, plaintiff demanded to see the search warrant. He did not tell the officers that the warrant was invalid because he was free from searches and seizures under the Act. In fact, he did not assert this claim until more than two months later, after a court had determined that the search and seizure did not violate his constitutional rights.

Plaintiff argues, however, that he had no obligation to identify himself as a newsperson. He contends that the officers

23

were on "inquiry notice" as to his status because he "told them [he] had websites," and Arraial knew he had other websites based upon Saul's prior investigation.[9]  As a result, he argues that the officers had an obligation to conduct an investigation to determine if he was protected by the Act before seeking a warrant.  We disagree.

As support for his position that the officers had a duty to investigate his status, plaintiff cites Steve Jackson Games, Inc. v. U.S. Secret Service, 816 F. Supp. 432 (W.D. Tex. 1993), aff'd on other grounds, 36 F.3d 457 (5th Cir. 1994).  His reliance is misplaced.

In Steve Jackson Games, the Secret Service agents had probable cause to believe that an employee of Steve Jackson Games (the company) had hacked into Bell South's 911 program and stored the information on his computers at home and at work.  They obtained a warrant for the company's offices, believing

---

[9]  Plaintiff identified four other websites, which he relies upon to establish his bona fides as a newsperson.  The website mrwestwood.com identifies itself as "Westwood, NJ — Pascack Valley Blog" and contains news and information about that municipality.  Plaintiff also created and maintained uhaul-sucks.com and uhaulsucks.wordpress.com "after a horrible moving experience" and described the websites as containing news and information about unsafe equipment rented by the company.  On joettinger.com, plaintiff identifies himself as a biology, chemistry, science, and tech teacher; SAT and ACT tutor; and publisher, and blogs about related topics.  This last website is the only website on which plaintiff used his real name.

that its business was to "put out games." 816 F. Supp. at 436. But, unlike here, there was never any suspicion that the owner of the company or any other plaintiff had engaged in any criminal activities. Id. at 435. It was for this reason that the District Court faulted the agents for failing to conduct any investigation regarding the nature of the company's business. Id. at 436, n.4.

Indeed, Steve Jackson Games provides support for the concept that the claimant's timely assertion of the statutory protection should be considered by the court in determining whether the protection applies. Unlike here, an employee told the agent that the company was in the publishing business at the time the warrant was executed. Id. at 437. It was because the Secret Service agents were advised of facts during the search that put them on notice of probable violations of the PPA that the Court found the continued seizure of the items thereafter was a basis for liability under the PPA. Id. at 440-41.

Plaintiff also argues that he was not required to divulge his claimed status to law enforcement, relying upon language in Too Much Media, supra, 206 N.J. at 239. Again, his reliance is misplaced.

First of all, the Court did not state that a newsperson need not assert his status in order to invoke the privilege

under the Shield Law. To the contrary, the Court observed that N.J.S.A. 2A:84A-21.3 "outlines a procedure for invoking the newsperson's privilege." Too Much Media, supra, 206 N.J. at 240. Before a newsperson is permitted to withhold information otherwise subject to compulsory disclosure, the claim of privilege must be invoked and the requisite prima facie showing must be made. See ibid.

Although the Act does not address this issue, the case for timely disclosure is even stronger when the protection afforded is to be "free from searches and seizures." By their nature, there is a measure of urgency in securing items sought in search warrants. See Sgro v. United States, 287 U.S. 206, 210-11, 53 S. Ct. 138, 140, 77 L. Ed. 260, 263 (1932) ("[I]t is manifest that the proof [of probable cause] must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time.") (emphasis added); State v. Novembrino, 105 N.J. 95, 124 (1987).

Freedom of the press is not compromised by requiring persons who claim protection under the Act to assert that claim as early as practicable. In this case, that would have been at the time the officers arrived at plaintiff's residence and announced they had a warrant. However, not only did plaintiff fail to assert his claim, he demanded to see the warrant as a

condition of admission, an act that ratified the officers' belief they were acting in full compliance with applicable laws.

Moreover, plaintiff's failure to timely advise the officers of his claimed status deprived them of the opportunity to comply with the requirement of N.J.S.A. 2A:84A-21.10 that applications to the court for warrants sought under the Act be approved in advance by the Attorney General "or the prosecutor of the county in which execution of the warrant will take place." The Act carved out an exception to the statutory prohibition for lawful searches and seizures where there is probable cause to believe a person who possesses the materials to be seized "has committed or is committing the criminal offense for which the materials are sought." N.J.S.A. 2A:84A-21.9(a). The search and seizure here unequivocally falls within the four corners of this "suspect" exception as the sufficiency of the evidence to support a finding of probable cause is established. However, the warrant was approved by the prosecutor of Somerset County, not the prosecutor of Bergen County, where it was executed. The presence of Saul at the execution of the search warrant suggests an awareness and tacit approval of the search by Bergen County law enforcement authorities. It is reasonable to conclude that, if plaintiff had made his position known to the officers before the warrant was executed, the approval of the Bergen County

Prosecutor would have been secured or the search would have been abandoned. No purpose identified by the Legislature is served by permitting a suspect in a criminal investigation to evade the application of the suspect exception by concealing his claim to protected status under the Act.

In sum, the legislative intent to preserve the First Amendment's freedom of the press is not compromised by requiring persons who claim protection under the Act to alert law enforcement officers to that fact in a timely manner. And, in our view, it would place a wholly unnecessary burden upon law enforcement officers to require them to conduct Internet searches of postings by the targets of criminal investigations to determine whether those persons might be protected under the Act prior to obtaining validly issued search warrants under circumstances such as those here.

We therefore hold that the detectives here were not required to conduct an investigation to determine whether plaintiff was protected by the Act under the facts known to them when they sought and executed the warrant. We further hold that, by failing to assert his claim to such protection when the warrant was executed, plaintiff waived any right to pursue a civil action under the Act.

A-1838-11T3

IV.

Even if plaintiff had alerted law enforcement to his claimed status in a timely manner, he was not entitled to protection under the Act. Rather than provide a blanket freedom from otherwise lawful searches and seizures, the Act limits the prohibited searches and seizures to those for "documentary materials obtained in the course of pursuing" the enumerated activities, N.J.S.A. 2A:84A-21.9, or what might be described as work product materials.

The materials sought by warrant here were not obtained by plaintiff in any newsgathering activity, and he has not identified any seized item as such. Plaintiff created amywollock.com to publish his personal "gripe" with Amy Wollock and invited others to "tell your own horror story." The website acknowledged its limited purpose, stating, "Web gripe sites are a protected form of free speech, well-established by case law. If you encounter the RU Screw or any other injustice, keep notes and wait until the time is right for your story to be safely told." The second website, amywollock.wordpress.com, described a similar purpose: "We hope that this website will be a place where kindred spirits can come together to heal and to learn how to enjoy life after escaping from Amy Wollock."

Implicitly acknowledging that these websites were not employed in newsgathering, plaintiff contends that the removal of amywollock.com from the Internet in 2007 and the condition attached to his probationary sentence prevented him from developing the websites as he had developed other Internet websites. However, his unrealized aspirations for the websites will not validate his claim to protection under the Act. Cf. Too Much Media, supra, 206 N.J. at 218-21, 238. We therefore conclude that plaintiff was not "free from searches and seizures" of the materials sought in the warrant because they were not documentary materials obtained in the pursuit of activities enumerated in the Act.

V.

In Point VII, plaintiff argues that Arraial and Saul violated N.J.S.A. 10:6-2(c) by "act[ing] in bad faith, and without probable cause that plaintiff had committed any crimes, to deprive plaintiff of his rights . . . and to confiscate" his property. He argues their involvement in the search and seizure of his property was "retaliatory in nature," based upon "harbored ill will toward plaintiff" as a result of his publishing activity and his successful appeal of the harassment conviction. He states their actions violated N.J. Const., art.

I, ¶¶ 6, 7, and that they are not entitled to qualified immunity. These arguments lack merit.

Plaintiff's challenge to the search on constitutional grounds was rejected in the denial of his suppression motion and again in the denial of his motion for reconsideration. He did not appeal either of those decisions and cannot relitigate the sufficiency of the evidence to establish probable cause for the issuance of the warrant now. See Velasquez v. Franz, 123 N.J. 498, 505 (1991). Because plaintiff has not been "deprived of any . . . substantive rights, privileges or immunities secured by the Constitution or laws of this State," his claim under N.J.S.A. 10:6-2(c) fails.

VI.

We next turn to the Bedminster defendants' argument that the trial court erred in denying their motion for counsel fees pursuant to Rule 1:4-8. This court's review of an order denying a motion for attorneys' fees is guided by the abuse of discretion standard. See Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 444 (2001); Barr v. Barr, 418 N.J. Super. 18, 46 (App. Div. 2011).

Rule 1:4-8 provides litigants with "a monetary sanction remedy including an attorney's fee allowance" to punish "frivolous pleadings." Pressler & Verniero, Current N.J. Court

Rules, comment 1 on R. 1:4-8 (2014); see R. 1:4-8(d)(2). Our courts have strictly construed the nature of conduct warranting sanction under R. 1:4-8, LoBiondo v. Schwartz, 199 N.J. 62, 116-17 (2009), mindful that "honest and creative advocacy should not be discouraged." Wyche v. Unsatisfied Claim and Judgment Fund of State, 383 N.J. Super. 554, 561 (App. Div. 2006) (quoting Iannone v. McHale, 245 N.J. Super. 17, 28 (App. Div. 1990)). Therefore, an award of attorney's fees under Rule 1:4-8 will not be appropriate where there is an objectively reasonable belief in the merits of an argument, see First Atl. Fed. Credit Union v. Perez, 391 N.J. Super. 419, 433 (App. Div. 2007); K.D. v. Bozarth, 313 N.J. Super. 561, 574-75 (App. Div.), certif. denied, 156 N.J. 425 (1998); or where the plaintiff is engaged in a legitimate effort to extend the law on a previously undecided issue. See Wyche, supra, 383 N.J. Super. at 560-61; see also N.J.S.A. 2A:15-59.1(b).

As we have noted, there have been no published opinions that interpreted or applied the Act in more than three decades. Under the circumstances, the trial court did not abuse its discretion in declining to award counsel fees to the Bedminster defendants pursuant to Rule 1:4-8.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1838-11T3